## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| SAM KOGON, DAVID WOULARD, ATTACK THE SOUND LLC, an Illinois limited liability company, , STAN BURJEK, JAMES BURJEK, BERK ERGOZ, HAMZA JILANI, MAATKARA WILSON, ARJUN SINGH, MAGNUS FIENNES, and MICHAEL MELL, each individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>GOOGLE LLC, a Delaware limited liability company,<br><br>Defendant. | Case No.<br><br><br>**DEMAND FOR JURY TRIAL** |

## COMPLAINT

Plaintiffs, Sam Kogon, David Woulard, Attack the Sound LLC, Stan Burjek, James Burjek, Berk Ergoz, Hamza Jilani, Maatkara Wilson, Arjun Singh, Magnus Fiennes, and Michael Mell, individually and on behalf of all others similarly situated, by their attorneys Loevy & Loevy, and for their complaint against Defendant Google LLC ("Google"), allege as follows:

## NATURE OF THE CASE

1.     This is a case about what Google took, what it built with it, and what it never paid for. Over years and across successive products, Google copied millions of copyrighted sound recordings, musical compositions, and lyric, including at least 44 million clips and 280,000 hours of music

documented in Google's own published research, with the actual training data, on information and belief, substantially larger, stripped away the identifying information that marked those works as someone's property, fed them into a training pipeline, and commercialized the result as Lyria 3, a commercial music generator embedded in a product ecosystem with 750 million users that performs the same creative function as the artists whose work it consumed, in the same markets where those artists earn their livelihoods, at a scale no individual creator can match.

2. In November 2023, Google DeepMind announced Lyria, its music-generation AI, and credited four researchers as core contributors: David Ding, Charlie Nash, Conor Durkan, and Yaroslav Ganin.[1] Within months, all four left Google DeepMind, formed a new company, and publicly launched Udio, another AI music-generation service trained on copyrighted recordings without authorization.[2] In June 2024, the RIAA[3] sued Udio for copyright infringement related to its training practices.[4] In October 2025, Udio settled with Universal

---

[1] "Transforming the future of music creation", Google DeepMind Blog, Nov. 16, 2023, https://deepmind.google/blog/transforming-the-future-of-music-creation/

[2] "Former Google Deepmind Researchers Assemble Luminaries Across Music And Tech To Launch Udio, A New AI-Powered App That Allows Anyone To Create Extraordinary Music In An Instant", PR Newswire, Apr. 10, 2024, https://www.prnewswire.com/news-releases/former-google-deepmind-researchers-assemble-luminaries-across-music-and-tech-to-launch-udio-a-new-ai-powered-app-that-allows-anyone-to-create-extraordinary-music-in-an-instant-302113166.html

[3] Recording Industry Association of America.

[4] "Record Companies Bring Landmark Cases for Responsible AI Against Suno and Udio in Boston and New York Federal Courts, Respectively", RIAA Website,

Music Group, agreeing to dismantle its existing system and rebuild using only licensed music.[5] Google watched the architects of its own music AI get sued for copyright infringement, and while that lawsuit was pending, launched Lyria 2.[6]

3. After Udio settled, Google released Lyria 3 on February 18, 2026, within the Gemini app, making it accessible to over 750 million monthly active users.[7] One week later, Google introduced ProducerAI, a standalone platform for creating, sharing, and publishing "full-length songs" with "dynamic vocals," available on both free and paid plans.[8] Across MuLan, MusicLM, and the Lyria product line, Google has never specified whose music was used to train these systems, who consented, or who was compensated.

4. Google documented the scale of what it took without permission, consent, or compensation. In its 2022 MuLan paper, Google researchers

---

https://www.riaa.com/record-companies-bring-landmark-cases-for-responsible-ai-againstsuno-and-udio-in-boston-and-new-york-federal-courts-respectively/

[5] "Universal Music settles copyright dispute with AI firm Udio", Reuters, Oct. 29, 2025, https://www.reuters.com/business/media-telecom/universal-music-settles-copyright-dispute-with-ai-firm-udio-2025-10-30/

[6] "Music AI Sandbox, now with new features and broader access", Google DeepMind Blog, Apr. 24, 2025, https://deepmind.google/blog/music-ai-sandbox-now-with-new-features-and-broader-access/

[7] Yawili, Joël, "A new way to express yourself: Gemini can now create music", Google Blog, Feb. 18, 2026, https://blog.google/innovation-and-ai/products/gemini-app/lyria-3/ (launch) and Alphabet Blog, "2025 Q4 Earnings Call", Feb. 4, 2026, https://abc.xyz/investor/events/event-details/2026/2025-Q4-Earnings-Call-2026-Dr_C033hS6/default.aspx (750 million monthly active users).

[8] Roman, Elias, "ProducerAI: Your music creation partner, now in Google Labs", Feb. 24, 2026, Google Blog, https://blog.google/innovation-and-ai/models-and-research/google-labs/producerai/

described gathering about 50 million internet music videos, extracting 30-second audio clips from each, and keeping roughly 44 million clips after filtering, representing nearly 370,000 hours of recorded music.[9] In its 2023 MusicLM paper, Google explained training on five million audio clips totaling 280,000 hours.[10] Both papers were published in peer-reviewed venues under the names of Google researchers. Neither mentions a license. Neither discusses a consent mechanism. Neither identifies a single rights holder whose permission was sought.

5.      Google knew these practices created legal risk before it released any product to the public. When Google finished MusicLM in early 2023, it initially withheld the model from public release while acknowledging concerns about cultural appropriation and misappropriation of creative content.[11] Four months later, Google released MusicLM through its AI Test Kitchen anyway, inviting consumer feedback to improve the model.[12] On information and belief, Google later shelved another internal music tool, "Orca," due to copyright and legal concerns, and then proceeded with Lyria 3.[13]

---

[9] Huang Qingqing, et al., "Mulan: A Joint Embedding of Music Audio and Natural Language", ArXiv, Aug. 26, 2022, https://arxiv.org/abs/2208.12415

[10] Agostinelli, Andrea, et al., "MusicLM: Generating Music From Text", ArXiv, Jan. 26, 2023, https://arxiv.org/abs/2301.11325

[11] Id.

[12] Yim, Kristin, "Turn ideas into music with MusicLM", Google Blog, May 10, 2023, https://blog.google/innovation-and-ai/products/musiclm-google-ai-test-kitchen/

[13] Langley, Hugh, "Google's DeepMind and YouTube built and shelved 'Orca,' a 'mind-blowing' music AI tool that hit a copyright snag", Business Insider, Nov. 21, 2024,

6.     Google's response to the legal risk was not to secure rights across the board before training. Instead, Google built Lyria on larger datasets and deployed it at a bigger scale, without resolving the licensing issue it had already identified. In January 2024, Billboard reported, citing four independent sources with direct knowledge of label negotiations, that Google had already trained on copyrighted major-label recordings before reaching out to rights holders.[14] If that is how Google handled the biggest and most sophisticated players in the industry, independent artists had even less visibility, leverage, or protection.

7.     Google didn't just have access to Plaintiffs' music; it operated the infrastructure through which much of that music reached the world. Google owns YouTube, one of the most important platforms for music discovery, distribution, and monetization, and it runs Content ID, YouTube's rights-management system.[15] Its database contains over 50 million reference files: full-length audio recordings provided by rights holders, including metadata identifying the artist, the rights owner, and the territories of ownership.[16]

---

https://www.businessinsider.com/google-deepmind-orca-ai-music-tool-copyright-isues-2024-11

[14] Leight, Elias, "Google Trained AI On Copyrighted Music, Sources Say – Now It's Trying To Make Deals", Billboard, Jan. 25, 2024, https://www.billboard.com/pro/google-youtube-trained-ai-copyrighted-music-before-deals/

[15] https://support.google.com/youtube/answer/2797370?hl=en

[16] "Decoding Content ID: How Artists Make Money on YouTube", AWAL Blog, https://www.awal.com/blog/content-id-how-artists-make-money-on-youtube/

Content ID works because artists and labels entrusted Google with these recordings and metadata to prevent unauthorized distribution of their music. Google accepted that trust, stored the content, and cataloged those works. On information and belief, Google then used the same infrastructure as a source for training a product designed to replace the music it was entrusted to protect.

8.      Google's training pipeline did not merely copy recordings. It dismantled them. On information and belief, Google's pipeline extracted audio into internal systems, converted it to machine-readable formats, segmented it into clips, tokenized it into computational representations for reuse in training, evaluation, fine-tuning, and subsequent product iterations, and in the process, stripped the copyright management information ("CMI") that identified each work: the artist name, the track title, the ISRC[17] code, the copyright notice, the ownership metadata. The expressive content was retained. The information identifying whose property it was, the information that enables licensing, attribution, and enforcement, was discarded. The point of that process was not passive storage. It was to extract musical value from existing works and redeploy that value in a commercial music generator.

---

[17] The International Standard Recording Code (ISRC) is a unique, permanent identifier assigned to individual sound recordings and music videos at the point of production or distribution. ISRCs are embedded in digital audio files and used throughout the music industry to track recordings across platforms, manage royalty payments, and link recordings to their rights holders. An ISRC travels with a recording wherever it is distributed, making it one of the primary mechanisms by which a recording remains connected to its owner. When Google's pipeline strips ISRC codes during ingestion, it severs that connection.

9.     Lyria 3, the model Google launched just weeks ago, doesn't just create generic instrumental beds. Google advertises that it can generate vocals, lyrics, harmonies, and backing vocals, including "realistic, natural, and nuanced" human voices with adjustable qualities.[18] Training a system to produce realistic, customizable vocal performances required Google to model specific vocal traits found in the recordings used for training. Google's privacy materials for ProducerAI acknowledge that voice-based features may involve extracting a biometric voiceprint from a vocal recording.[19] This case, therefore, involves not only copied compositions and sound recordings but also Google's use of human vocal identity.

10.     Google's public statements about Lyria 3's training data are notable for what they do not say. Google has stated it was "very mindful of copyright and partner agreements."[20] It has not named any agreement. It has not specified a single license covering training data. It has not explained any process by which an artist could have consented, objected, or opted out. Google also claimed that Lyria 3 is "designed for original expression, not for mimicking existing artists," and that it has "filters in place to check outputs against existing content."[21] In the same breath, Google acknowledged that its approach

---

[18] https://deepmind.google/models/lyria/

[19] https://www.producer.ai/privacy

[20] Yawili, Joël, "A new way to express yourself: Gemini can now create music", Google Blog, Feb. 18, 2026, https://blog.google/innovation-and-ai/products/gemini-app/lyria-3/

[21] Id.

"might not be foolproof."[22] Google has not reconciled its marketing language with the extent and method of copying described in its published research. Google marketed a system built on copyrighted works as responsibly sourced and designed for original expression.

11.    On information and belief, Plaintiffs' copyrighted recordings, compositions, and lyrics are among the works that Google ingested, copied, processed, and commercially exploited without permission or compensation. Google's published papers describe training on datasets derived from tens of millions of internet music videos, the same type of content that Plaintiffs distribute commercially on YouTube and other major platforms. Google has not disclosed any mechanism to exclude specific artists' work from its pipeline, nor has it identified any filter that could have done so.

12.    On information and belief, Google's pipeline copied Plaintiffs' works in their entirety, converted audio recordings and lyric text into machine-readable representations, and retained those representations, along with all derivative computational artifacts, for repeated use in training, fine-tuning, evaluation, and product iteration across successive model generations. The copies made to build the first Lyria model were stored in Google's systems, reused to train Lyria 2, reused again to train Lyria 3, and remain in Google's possession today.

---

[22] Id.

13.     Plaintiffs are independent musicians and songwriters. Some make their main living from music, while others pursue music alongside other jobs. What they share is that they depend on their music to generate economic returns. They depend on licensing, streaming, sync placements, commissioned work, and similar opportunities.[23] Every dollar that music generates depends on a single premise: if you want to use a musician's work, you ask, and you pay.

14.     Google, by contrast, is among the largest companies worldwide. In fiscal year 2025, Alphabet reported annual revenues exceeding $400 billion.[24] The Gemini app has over 750 million monthly active users. Google operates YouTube, one of the world's largest music platforms; Content ID, a major music rights-management system; and now Lyria 3 and ProducerAI, products that generate music competing with the artists whose works help populate and sustain those platforms. Google did not enter this market as an outsider; it entered from the center of the existing music ecosystem.

15.     The competitive harm is not theoretical. Lyria 3's current short-form outputs are sufficiently long to compete for many uses that drive sync

---

[23] A sync placement (short for synchronization placement) is the licensing of a musical recording or composition for use alongside visual media, such as a television show, film, advertisement, video game, podcast, or social media content. Sync licensing is one of the primary revenue streams for independent artists because it pays a negotiated fee per use rather than a fraction-of-a-cent-per-stream royalty. It is one of the market segments most directly threatened by AI-generated music, because sync buyers select music to match a specific mood, genre, tempo, and duration, which are exactly the parameters a user specifies when prompting Lyria 3.

[24] https://s206.q4cdn.com/479360582/files/doc_financials/2025/q4/2025q4-alphabet-earnings-release.pdf

licensing and background-music placements: brand spots, social-media ads, podcasts, games, and creator content. ProducerAI expands that competition to longer-form recordings and custom music. Dream Track places AI-generated music directly into YouTube creator workflows on the same platform where Plaintiffs' music is hosted and licensed.[25] And Google controls all three sides of this marketplace: it hosts the licensed catalog, supplies the AI-generated substitute, and operates the recommendation algorithm that determines which music reaches listeners.

16.     Google's product choices highlight the competitive advantage it gained from Plaintiffs' works. In June 2025, Google released Magenta RealTime, an open-weight music model trained on roughly 190,000 hours of stock music under permissive licenses.[26] Google did not promote Magenta RealTime as "professional-grade" or vocally realistic. The model mainly generates instrumental outputs. Lyria 3, however, trained on tens of millions of copyrighted recordings covering every major genre, artist, and vocal style, produces vocal, lyrical, multi-genre outputs that Google markets as "high-fidelity" and "professional-grade."[27] The difference in capabilities between Google's stock-music model and its copyrighted-music model shows the

---

[25] Cohen, Lyor, and Reid, Toni, "An Early Look At The Possibilities As We Experiment With AI and Music", YouTube Official Blog, Nov. 16, 2023, https://blog.youtube/inside-youtube/ai-and-music-experiment/

[26] Eck, Douglas, "Welcome to Magenta!", Magenta Blog, Jun. 1, 2026, https://magenta.tensorflow.org/blog/2016/06/01/welcome-to-magenta/

[27] https://deepmind.google/models/lyria/

competitive edge Google gained from Plaintiffs' works without permission or payment.

17.     Google had every opportunity to develop this product legally. It owns YouTube and runs Content ID. It has long-standing relationships with major labels and distributors. It has the technical infrastructure, financial resources, and industry connections to clear rights before training. Google chose not to do so, not because licensing was impossible, but because copying was faster and cheaper.

18.     Google designed its products to release AI-generated music into commercial markets without sufficient provenance, attribution, or rights-clearance indicators. Google's systems accept prompts that specify particular artists and use those identity cues to influence outputs. Once created, these outputs can be downloaded, shared via links, and published, often without the generation-context disclosures available within Google's interface. SynthID watermarking remains imperceptible to listeners. ProducerAI shows user account names alongside produced tracks and informs users that they "own" the output. Consequently, realistic, professional-grade music circulates in the same markets as licensed human-created music, attributed to users or no one, with no disclosure that the underlying system was built on copyrighted works and no indication that any artist endorsed, authorized, or was compensated for the output.

19.     Plaintiffs assert claims for direct copyright infringement under 17 U.S.C. § 501, including infringement of the reproduction right through

unauthorized copying, retention, and reuse of sound recordings, musical compositions, and lyrics, and infringement of the distribution right through unauthorized dissemination of copies to third parties. Plaintiffs assert claims for contributory and vicarious copyright infringement arising from Google's knowing facilitation of, material contribution to, and financial benefit from downstream infringement by users of its generative music systems. Plaintiffs assert claims under the Digital Millennium Copyright Act for removal and alteration of copyright management information (17 U.S.C. § 1202(b)), for providing and distributing false CMI in connection with AI-generated outputs (§ 1202(a)), and for circumvention of technological access controls protecting copyrighted works on third-party platforms (§ 1201).

20.     Plaintiffs assert claims under the Lanham Act, 15 U.S.C. § 1125(a), for false endorsement arising from Google's use of artist identity cues to generate and distribute music in a manner likely to cause confusion as to endorsement, sponsorship, or affiliation, and for false advertising arising from Google's misrepresentations about the sourcing, originality, and rights-clearance status of its generative music products.

21.     Plaintiffs assert claims under the Illinois Biometric Information Privacy Act, 740 ILCS 14/1 et seq., for Google's extraction and storage of voiceprints from vocal performances without the informed written consent or published retention policies BIPA requires; under the Illinois Right of Publicity Act, 765 ILCS 1075/1 et seq., for Google's commercial use of Plaintiffs' voices and identities to develop and monetize Lyria 3 without consent; under the

Illinois Uniform Deceptive Trade Practices Act, 815 ILCS 510/1 et seq., for marketing and distributing AI-generated music in a manner likely to cause confusion about source, authorization, and rights clearance; under the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 et seq., for deceptive and unfair practices that induced the commercial substitution of AI-generated music for licensed human-created music, causing actual economic injury to Illinois-resident artists; and for unjust enrichment under Illinois common law arising from Google's extraction of commercial value from Plaintiffs' works, voices, and identities without authorization or compensation.

22.     Plaintiffs seek damages for Google's unauthorized reproduction, retention, and exploitation of their copyrighted works and identities, and injunctive relief to halt Google's ongoing infringement. Plaintiffs also seek disgorgement of the profits Google derived from building and monetizing those products. A terms-of-service provision is not a training license. A watermark is not consent. The copyright, privacy, and publicity laws of the United States and Illinois apply to Google, and they apply here.

23.     This case arises in the same broader wave of litigation challenging unlicensed AI training on music, but Google's conduct is different: Google owns the dominant music distribution platform, operates the dominant music rights-management system, and had documented knowledge, through its own research, its internal deliberations, and the fate of Lyria's architects, that its training practices infringed copyrights.

## **PARTIES**

24.     Plaintiff David "Davo Sounds" Woulard ("Woulard") is a military veteran, an active Chicago firefighter, and a Chicago-based singer-songwriter. A non-exhaustive list of the sound recordings and musical-composition works (including lyrics) which Woulard owns, co-owns, or holds exclusive rights is identified in Exhibit A-[Woulard] (the "Woulard Works"). Registered works include, by way of example, the sound recording "Bad News" (single), Reg. No. SR0000845765, registered March 25, 2019, and the sound recording "Prequel to the Sound" (collection of seven songs), Reg. No. SRU001313672, registered March 28, 2018.

25.     Woulard is the principal songwriter and lead vocalist for the indie R&B band Attack the Sound and is a credited songwriter of the band's releases.

26.     Attack the Sound LLC ("ATS") is an Illinois limited liability company through which Attack the Sound releases music and exploits related rights. ATS owns, co-owns, or holds exclusive rights in certain Attack the Sound releases identified in Exhibit A-[Woulard] and manages the commercial exploitation of releases performed under the Attack the Sound name.

27.     Since 2019, Attack the Sound has released ten singles and a six-track project, "Love Is War: Packed." Its music is commercially distributed on major streaming platforms, including Spotify, YouTube, Apple Music, Amazon Music, and Pandora.

14

28.     Woulard writes and records his vocal performances for Attack the Sound in Illinois.

29.     Woulard's recorded vocal performances are embodied in the Woulard Works, including the Attack the Sound releases identified in Exhibit A-[Woulard].

30.     Plaintiffs Stan Burjek and James Burjek (together, the "Burjek Plaintiffs") are a Shorewood, Illinois-based father-and-son songwriting and recording duo. They release folk rock and shoegaze music under the names "The Burjek Collective," "Smackin' Billies," and "Pool Deck Duel." Stan is a guitarist, songwriter, and vocalist; James is a multi-instrumentalist.

31.     A non-exhaustive list of the sound recordings and musical-composition works (including lyrics) as to which one or both of the Burjek Plaintiffs own, co-own, or hold exclusive rights is identified in Exhibit A-[Burjek] (the "Burjek Works"). Registered works include, by way of example, the sound recording "This Road" (album), Reg. No. SRU001533131, registered February 8, 2023.

32.     Since 2023, The Burjek Collective, Smackin' Billies, and Pool Deck Duel have released multiple singles, and the ten-song Smackin' Billies album "This Road" was released in May 2023. Their music is commercially distributed on major streaming platforms, including Spotify, YouTube, Apple Music, Amazon Music, and Pandora. Stan is a credited songwriter and copyright owner of material released by The Burjek Collective, Smackin' Billies, and Pool Deck Duel.

33.     Stan recorded vocal parts for many Burjek releases, including "This Road," "Fire Years," "What She's Thinking," "Who Would You Be," "Lights on our Faces," "Dirty Them Dogs," "Nothing With You," "Rock Salt Hill," "This Road Pt. 2 (Epilogue)," "Man on the Radio," "Little Bales of Hay," and "Perfectly Served." James recorded vocal parts on "How Can You See Love," released by Pool Deck Duel.

34.     All The Burjek Collective, Smackin' Billies, and Pool Deck Duel material was recorded at the Burjeks' home studio in Shorewood, Illinois.

35.     Although neither Stan nor James is a full-time musician, their works are economic assets whose value depends on the licensing and market framework this action seeks to protect.

36.     Plaintiffs Berk Ergoz, Hamza Jilani, Maatkara Wilson, and Arjun Singh (collectively, the "Directrix Plaintiffs") perform as "Directrix," a Chicago-based band. A non-exhaustive list of the sound recordings and musical-composition works (including lyrics) as to which one or more of the Directrix Plaintiffs own, co-own, or hold exclusive rights is identified in Exhibit A-[Directrix] (the "Directrix Works").

37.     Directrix began as the passion project of Hamza and Berk nearly ten years ago in Dubai. After moving to Illinois to attend the University of Chicago, they joined with Wilson and Singh to write, record, perform, and release music as Directrix.

38.     In March 2023, Directrix released "The Whale Album," a collection of eight songs recorded in 2023. In July 2025, Directrix released the five-song

project "Halotherapy." Those projects, together with the July 2023 single "(I Don't) Wanna Fall in Love," were recorded in Chicago, Illinois. All four Directrix Plaintiffs are credited songwriters and copyright owners of this material.

39.     Directrix distributes its music to major streaming platforms, including Spotify, Apple Music, Amazon Music, YouTube, Pandora, and Tidal, through digital distributor EmuBands.

40.     Members of Directrix recorded vocal parts across these releases, including: "Buttermilk" (main vocals: Plaintiff Maatkara; backing vocals: Plaintiff Hamza); "The Breaching Song" (main vocals: Plaintiff Maatkara; backing vocals: Plaintiffs Hamza, Berk, and Maatkara); "Hell's Breeze" (main vocals: Plaintiff Hamza; backing vocals: Plaintiffs Maatkara, Hamza, and Berk); "Trick Mirror" (main vocals: Plaintiff Maatkara; backing vocals: Plaintiffs Hamza and Maatkara); and "(I Don't) Wanna Fall in Love" (main vocals: Plaintiff Maatkara; backing vocals: Plaintiff Hamza).

41.     The Directrix Works identified in Exhibit A-[Directrix] include works recorded and publicly released from Illinois.

42.     The Directrix Plaintiffs continue to write, record, perform, and release music as Directrix.

43.     Although the Directrix Plaintiffs are not full-time musicians, their works have commercial value and their economic interests are directly affected by the conduct alleged in this Complaint.

44.     Plaintiff Magnus Fiennes is a Los Angeles-based composer, songwriter, and producer. Fiennes is the author and copyright owner of the

musical compositions, sound recordings, and lyrics identified in Exhibit A-[Fiennes]. Registered works, with registration numbers and dates, are identified in Exhibit A-[Fiennes]. Fiennes' registered works include, by way of example, "Let armies loose," Registration No. PAu002889490, registered August 8, 2020.

45.     Fiennes' career spans film, television, theatre, and video games. He has composed more than 240 hours of music, including the score for the BBC's "Death in Paradise" (15 seasons and ongoing), its spin-off "Beyond Paradise" (4 seasons and ongoing), and the dramas "Hustle," "Murphy's Law," and "The Last Enemy," as well as the feature film "Onegin" and the animated project "Casper's Scare School." He won Best Music at the Reims International TV Awards for "Five Days."

46.     Fiennes earns income through synchronization licensing, commissioned scoring, and production music, the same markets in which Google's products now compete. He has composed music for commercial campaigns for brands including Coca-Cola, Ford, Kraft, and L'Oréal, and has produced and written for major artists including Shakira, Tom Jones, Lenny Kravitz, Sinéad O'Connor, and the Spice Girls.

47.     Fiennes created and owns all music publishing and master recording rights to "Freefonix," a children's animated series of 40 episodes (BBC Worldwide, 2007). All episodes are available on YouTube. The series features more than 80 songs co-written by Fiennes. Fiennes also composed the music and owns all music publishing and master recording rights for the

18

feature films "Robots" (2024, NEON) and "Pervert's Guide to Ideology" (Zeigler Films, 2011).

48.     Fiennes releases music on major streaming platforms, including Spotify, Apple Music, Amazon Music, YouTube, and Pandora.

49.     Plaintiff Michael Mell, who records and produces music under the name "Mic Mell," is an Atlanta-based songwriter and producer who owns or exercises the exclusive control over the copyrights for the sound recordings and musical-composition works (including lyrics) identified in Exhibit A-[Mell] (the "Mell Works"). Mell is the principal songwriter and recording artist for all works released as Mic Mell.

50.     Mell wrote and recorded the 12-song project "Muff-ucker" (2006) and the 13-song project "Low Blood Sugar" (2010). He has also released music as "Barcode Lounger" and "Funkanetics," including the 2006 Funkanetics single "All In A Day's Work Part I," and the 2006 Barcode Lounger album "Tech Support, Vol. 2 (Remastered) – EP." A non-exhaustive list of sound recordings and musical-composition works (including lyrics) owned or exclusively controlled by Mell are identified in Exhibit A-[Mell].

51.     Mell's projects are commercially distributed on major streaming platforms, including Spotify, Apple Music, Amazon, Pandora, and Tidal.

52.     Plaintiff Sam Kogon is a New York-based singer and songwriter. Kogon is the author and copyright owner of the sound recordings, musical compositions, and lyrics identified in Exhibit A-[Kogon] (the "Kogon Works"). Kogon is the lead composer, lyricist, and performer on all works published

under his name, and all such works are registered with the U.S. Copyright Office. Registered works, with registration numbers and dates, are identified in Exhibit A-[Kogon]. Registered sound recordings include, by way of example, "Before You Knew Me" (album), Reg. No. SRU001226685, registered August 11, 2015.

53. Kogon has collaborated on session work with Al Jardine of The Beach Boys, written songs with Grammy-nominated Patty Smyth, fronted the revival of 1960s group The Left Banke, and contributed music to the BBC television series "Death in Paradise," "Beyond Paradise," and "Not Going Beyond Paradise." Kogon earns income from, among other things, synchronization licensing and commissioned work for film and television.

54. Under his own name, Kogon released his debut album, "Before You Knew Me," in September 2015, and his second studio album, "Psychic Tears," in October 2016. Kogon released the "Sam Kogon EP," a collection of four songs, in April 2022, and released singles "America" and "Open My Mind" in November 2024 and September 2025, respectively.

55. Kogon's works are commercially distributed on major streaming platforms, including Spotify, Apple Music, Amazon, Pandora, Tidal, and YouTube.

56. Defendant Google LLC is a Delaware limited liability company and a wholly owned subsidiary of Alphabet, Inc., with its principal place of business at 1600 Amphitheatre Parkway, Mountain View, California.

## JURISDICTION AND VENUE

57.     This action arises under the Copyright Act, 17 U.S.C. §§ 101 et seq., the Digital Millennium Copyright Act, 17 U.S.C. §§ 1201–1202, and the Lanham Act, 15 U.S.C. § 1125(a). This Court has original subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1338(a). Subject matter jurisdiction also exists under the Class Action Fairness Act, 28 U.S.C. § 1332(d), because the proposed Classes and Subclasses include more than 100 members, the aggregate amount in controversy exceeds $5,000,000 exclusive of interest and costs, and minimal diversity exists. For purposes of 28 U.S.C. § 1332(d), Google LLC is a citizen of Delaware, where it is organized, and California, where it maintains its principal place of business.

58.     This Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) over Plaintiffs' state-law claims, including claims under the Illinois Biometric Information Privacy Act, 740 ILCS 14/1 et seq.; the Illinois Right of Publicity Act, 765 ILCS 1075/1 et seq.; the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS 510/1 et seq.; the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 et seq.; and for unjust enrichment, because those claims arise from the same nucleus of operative facts as Plaintiffs' federal claims and form part of the same case or controversy under Article III.

59.     This Court has personal jurisdiction over Google LLC. Google purposefully directs and conducts activities in Illinois that are challenged in this action. Google maintains offices and personnel in Chicago, Illinois, is

authorized to transact business in Illinois, maintains a registered agent for service of process in the state, and offers, operates, markets, and distributes the accused products and services in Illinois, including YouTube, the Gemini app, ProducerAI, and related music-generation features. Google derives substantial revenue from the use of those products and services in this District. The claims of the Illinois-based Plaintiffs arise directly out of or relate to Google's distribution, operation, and commercialization of the accused products in Illinois and Google's exploitation of works created, recorded, and owned in Illinois and of the voices and identities of Illinois residents. The exercise of personal jurisdiction is consistent with the Illinois long-arm statute, 735 ILCS 5/2-209, and with due process.

60.     Venue is proper in this District under 28 U.S.C. § 1400(a) because Google may be found here. Venue is independently proper under 28 U.S.C. § 1391(b)(1) and (b)(2) because Google resides in this District within the meaning of 28 U.S.C. § 1391(c)(2), and because a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in this District, including Google's distribution, operation, and commercialization of the accused products here, the creation and recording of Plaintiffs' works in Illinois, and the resulting injuries to Illinois-based Plaintiffs.

## FACTUAL BACKGROUND

*Plaintiffs and Their Copyrighted Works*

61.     Plaintiffs are independent artists, songwriters, and producers who own copyrights in many sound recordings, musical compositions, and lyrics.

Exhibit A, attached and incorporated by reference, lists a non-exhaustive sample of the copyrighted works in question (the "Copyrighted Works"). Works registered with the U.S. Copyright Office are specifically identified in Exhibit A with registration numbers and dates.

62.     Plaintiffs' works have value because they are original. They showcase unique combinations of melody, harmony, rhythm, instrumentation, production choices, vocal performance, lyrical content, and creative direction. Plaintiffs devote significant time, skill, and resources to creating, recording, distributing, and promoting their music. Their financial returns rely on licensing markets, streaming royalties, synchronization deals, and commissioned work, markets where the value of each work depends on the legal principle that use requires authorization and payment.

63.     Plaintiffs' works are commercially available on YouTube and other major streaming platforms, including Spotify, Apple Music, Amazon Music, Tidal, and Pandora. Plaintiffs' works were accessible on YouTube during the periods when Google compiled the training datasets described below. Google provided no mechanism for any artist to exclude their works from Google's training pipeline, did not identify any filter that could have done so, and offered no way for artists to opt out.

*Google's Control of the Music Supply Chain Through YouTube*

64.     Google is not an outsider in the music industry. Google owns and operates YouTube, and YouTube's Terms of Service identify Google LLC as the

entity providing the YouTube service.[28] YouTube is not a neutral conduit. It is a vertically integrated distribution, monetization, and enforcement system that sits at the center of the modern music economy.

65.     YouTube is one of the primary ways listeners discover and consume music and music-adjacent content, including official releases, music videos, live performances, lyric videos, and user-generated videos built around songs. YouTube has publicly reported that more than two billion logged-in viewers watch music videos each month and more than 125 million subscribers use YouTube Music and YouTube Premium.[29] In the twelve months ending June 2025, YouTube paid more than $8 billion to the music industry across advertising and subscription revenue.[30]

66.     YouTube markets that role to artists and the industry. It presents itself as a long-term home for artists and songwriters and a reliable channel for monetization. Those representations matter because they are the basis on which artists deliver their music to the platform. Artists who upload or distribute through YouTube do so on the understanding that the platform will

---

[28] https://www.youtube.com/t/terms

[29] "$8 Billion: YouTube's twin engine continues to fuel the future of music", YouTube Official Blog, Oct. 23, 2025, https://blog.youtube/news-and-events/8-billion-youtubes-twin-engine-continues-to-fuel-the-future-of-music/

[30] Id.

host, promote, and monetize their work, not repurpose it as raw material for a competing product.

67.     This scale gives Google structural leverage over artists, labels, and publishers. For many working musicians, YouTube is not optional. Being absent from YouTube often means missing out on a major avenue for fan discovery, audience growth, and revenue. Google uses that position to set the rules of access, monetization, and enforcement for the music that flows through its platform.

68.     Google's control extends beyond distribution and monetization to copyright enforcement. Google operates Content ID, YouTube's automated content identification system. Content ID compares every video uploaded to YouTube against a database of reference files submitted by copyright owners.[31] Rights holders who participate in Content ID are required to provide the full-length audio recording together with metadata identifying, at a minimum, the title, artist, and record label.[32] YouTube creates a digital fingerprint from each reference file and uses it to detect matches in user uploads. Depending on the rights holder's settings, a match can trigger a block, monetization through advertising, or viewership tracking.[33]

---

[31] "How Content ID works", YouTube Help,
https://support.google.com/youtube/answer/2797370?hl=en

[32] "Content eligible for Content ID", YouTube Help,
https://support.google.com/youtube/answer/2605065?hl=en

[33] "Content ID for music partners", YouTube Help,
https://support.google.com/youtube/answer/2822002?hl=en

69.     Content ID is not a superficial reporting tool. YouTube's partner guidelines require Content ID participants to have exclusive rights in the reference material, to provide sufficiently distinct reference content, and to supply identifying asset metadata. For sound recordings and music videos, YouTube's guidelines call for, at a minimum, the title, artist, and record label.[34] That metadata is how YouTube tells uploaders what is being claimed and by whom. In practice, Content ID gives Google something no third party possesses: an industrial-scale, continuously updated fingerprint database of copyrighted music, linked to ownership metadata, territorial rights information, and monetization preferences. Google does not need to guess which recordings are copyrighted or who owns them. It operates the system that identifies, catalogs, and routes revenue to their owners.

70.     YouTube's Terms of Service confirm that music on YouTube is not available for unrestricted copying. The Terms prohibit users from reproducing, downloading, or otherwise using content except as expressly authorized by the service or with prior written permission from YouTube and the relevant rights holders.[35] The Terms also prohibit circumventing or interfering with security-related features that prevent or restrict copying.[36] In other words, the

---

[34] https://support.google.com/youtube/answer/2605065?hl=en

[35] "Terms of Service", YouTube, Dec. 14, 2023, https://www.youtube.com/static?template=terms

[36] Id.

platform's rules are explicit: copyrighted music on YouTube is not a free corpus for extraction and reuse.

71.     YouTube's Terms also confirm Google's operational control over the copies of music that flow through YouTube. The Terms provide that Google may retain server copies of content within Google-controlled infrastructure, even after a creator removes or deletes the content from public view.[37] Once artists and rights holders deliver music to YouTube as part of the ordinary distribution and monetization process, Google retains the practical ability to store, process, and retain those works.

72.     Taken together, YouTube's scale, its monetization dominance, its Content ID fingerprint-and-ownership machinery, and its contractual control over access and retention give Google end-to-end influence over the music supply chain. It is the company that hosts the recordings, fingerprints them, monetizes them, polices them, and retains server copies of them. That structural position is the foundation that enabled Google to pivot from distributor to competitor by developing and commercializing generative music systems trained on the recordings it was entrusted to protect.

*Google's Music-AI Pipeline*

73.     Google's generative music business did not appear overnight. It is the product of a long-running internal program, documented in Google's peer-reviewed publications, that methodically built the components required to

---

[37] Id.

convert recorded music into machine-readable units at scale and generate new recordings that sound like finished, market-ready tracks.

74. In 2016, Google publicly launched the Magenta project as a Google Brain initiative explicitly focused on machine learning for art and music generation, with an emphasis on building tooling, releasing models, and developing infrastructure.[38] That program, established years before Lyria, showed that Google was investing in music generation as a core research and product theme.

75. The through-line across Google's published work is a consistent technical architecture built in stages. First, a neural audio codec[39] converts audio recordings into discrete numerical tokens, which are compact representations that can later be decoded back into audio waveforms. Second, language-model-style generators are trained to predict and produce token sequences in the same manner as large language models generate text. Third, a text-conditioning layer aligns the generator with natural-language prompts, allowing users to request music by describing a genre, mood, instrument, or style. Google has used this approach repeatedly because it makes audio

---

[38] Eck, Douglas, "Welcome to Magenta!", Magenta Blog, Jun. 1, 2016, https://magenta.tensorflow.org/blog/2016/06/01/welcome-to-magenta/

[39] A neural audio codec is a software system that compresses audio into a sequence of numerical codes called tokens, and can later decompress those tokens back into audio. Unlike traditional audio compression such as MP3, a neural codec is trained on large quantities of audio so that its tokens capture not just the raw sound but the musically meaningful features of a recording, including melody, timbre, rhythm, and vocal texture. Once a recording has been converted into tokens, those tokens can be processed by the same kinds of language models that generate text. That is how Google's pipeline turns recorded music into training data for a music generator.

generation scalable: once recordings are tokenized, they can be trained on and generated in the same way that text is trained on and generated.

76.     Google built the first stage of this pipeline, the audio codec, through its SoundStream work, published in 2021.[40] SoundStream is a neural audio codec designed to compress speech, music, and general audio into quantized embeddings that can later be decoded back into waveforms.[41] This codec stage matters because it converts a full-fidelity audio recording into a compact, discrete representation that a model can learn from, store, and reproduce in audio form. A recording is not merely analyzed. It is translated into a sequence of numerical tokens that preserves its expressive content.

77.     In October 2022, Google published AudioLM, which demonstrated that realistic audio could be generated by training transformer models on tokenized recordings using next-token prediction, "as one would train a text language model," in Google's description.[42] AudioLM combined semantic tokens that capture musical structure, including melody, harmony, and rhythm, with

---

[40] Zeghidour, Neil, et al., "SoundStream: An End-to-End Neural Audio Codec", Google Research Blog, 2021, https://research.google/pubs/soundstream-an-end-to-end-neural-audio-codec/

[41] Quantized embeddings are compact numerical representations of audio. "Embedding" means converting audio into a list of numbers that captures its meaningful characteristics. "Quantized" means rounding those numbers to a fixed set of allowed values, the way rounding to the nearest whole number reduces infinite decimal possibilities to a manageable set. Quantization makes the representations small enough to store and process efficiently at scale while preserving enough detail to reconstruct recognizable audio when decoded back into sound.

[42] Borsos, Zalan, et al., "AudioLM: A Language Modeling Approach to Audio Generation", ArXiv, Jul. 26, 2023 (v2 most recent revision, v1 submitted on Sep. 7, 2022), https://arxiv.org/abs/2209.03143

acoustic tokens produced by SoundStream that capture waveform detail. The result was a system that could generate new audio by predicting what comes next in a token sequence, then decoding those tokens back into sound.

78.     Google then built the control layer that allows ordinary users to steer generated music with prompts. In 2022, Google introduced MuLan, a joint music-text embedding model designed to map audio from music and natural-language descriptions into a shared representation space.[43] Rather than treating music tags as a fixed vocabulary, Google designed MuLan so that a user's words, including genres, moods, instruments, eras, artists, and other descriptive language, could be aligned directly with the sound of recorded music.[44]

79.     MuLan was trained on an extraordinary scale. Google described assembling a training corpus by collecting approximately 50 million internet music videos, extracting a 30-second audio clip from each, filtering the results through a music audio detector, and retaining roughly 44 million clips totaling approximately 370,000 hours of recorded music.[45] In plain terms, that is more than 42 years of continuous music. This was not a small academic experiment. It was an industrial-scale ingestion process designed to provide a reusable foundation for downstream commercial systems.

---

[43] Huang, Qingqing, "MuLan: A Joint Embedding of Music Audio and Natural Language", ArXiv, Aug. 26, 2022, https://arxiv.org/abs/2208.12415

[44] Id.

[45] Id.

80.    Google paired those audio clips with vast quantities of human-authored text, mined from the surrounding ecosystem. For each music video, Google reported using three categories of text supervision: short-form text, including video titles and tags; long-form text, including video descriptions and comments; and playlist titles from 171 million playlists linked to the music videos.[46] Google's paper makes clear that these text sources include the kinds of identifiers that matter most to working musicians: artist names, song titles, album names, genre labels, instruments, and mood descriptors.[47] The training signals were not merely style labels. They included language commonly used to identify and locate specific music and specific creators.

81.    Google acknowledged that much of this text was noisy and not reliably descriptive of the underlying music. Google's response was not to limit training to licensed or clearly authorized corpora. Instead, Google described an automated filtering strategy: a BERT classifier[48] fine-tuned on 700 manually curated sentences to distinguish music-descriptive text, applied at scale to filter long-form annotations, with rule-based heuristics to clean short-form

---

[46] Id.

[47] Id.

[48] 6 BERT (Bidirectional Encoder Representations from Transformers) is a language-processing model developed by Google that analyzes text by considering the context of words in both directions within a sentence. Here, Google used a BERT model trained on just 700 hand-picked examples to automatically sort vast quantities of internet text into "music-descriptive" and "not music-descriptive" categories, enabling Google to filter and pair text labels with audio clips at a scale that manual review could never achieve.

text.[49] The architecture itself underscores that Google built MuLan as foundational infrastructure, not a one-off demonstration. Google used a two-tower design, an audio encoder and a text encoder mapping inputs into a shared embedding space, the same family of design choices Google uses across modalities when it intends to build scalable, general-purpose systems.[50]

82.     MuLan matters because Google later treated it as the enabling bridge between copyrighted audio at scale and text-conditioned generation. In Google's subsequent MusicLM work, Google described using MuLan embeddings derived from audio during training, and then substituting MuLan embeddings derived from a text prompt at inference time — a design that, in Google's words, "eliminates the need for captions at training time altogether" and "allows training on massive audio-only corpora."[51] In plain terms, MuLan allowed Google to train its music generators on enormous collections of recorded music without needing permission-based, captioned datasets, while still producing a system that responds to text prompts.

83.     In January 2023, Google introduced MusicLM, a text-to-music generator that combined AudioLM's generation architecture with MuLan's text conditioning.[52] MusicLM was not framed as an academic novelty. It was

---

[49] Id.

[50] Id.

[51] Agostinelli, Andrea, et al., "MusicLM: Generating Music From Text", ArXiv, https://ar5iv.labs.arxiv.org/html/2301.11325

[52] Id.

presented as an end-to-end system capable of producing high-fidelity music from written prompts and sustaining coherence for several minutes — finished audio, in the same format and with the same commercial utility as a human-made recording.[53]

84.    Google disclosed the scale of the music corpus used to train MusicLM's generative stages. While certain representation models were trained on the Free Music Archive, the tokenizers and autoregressive models for MusicLM's semantic and acoustic modeling stages were trained on a dataset of five million audio clips totaling 280,000 hours of music, reflecting nearly 32 years of continuous recordings.[54] Google described training practices consistent with high-throughput copying and reuse: the system trains on repeated random crops of target audio, 30 seconds for semantic modeling and 10 seconds for acoustic modeling, enabling repeated resampling and reshuffling of the same underlying recordings across training epochs and stages.[55]

85.    Google did not identify the specific recordings, rights holders, licenses, or provenance of this 280,000-hour training corpus. Google described the dataset only in aggregate, while emphasizing that its architecture was designed to scale beyond captioned data. Given the stakes for creators and the

---

[53] Id.

[54] Id.

[55] Id.

obvious copyright sensitivity of audio training at that scale, Google's silence about the training corpus's provenance is itself significant.

86.     Alongside improving quality and controllability, Google focused on speed and deployability, both crucial for turning research models into consumer products. In 2023, Google DeepMind released SoundStorm, an efficient model for generating neural codec tokens capable of producing 30 seconds of audio in just 0.5 seconds.[56] This is roughly two orders of magnitude faster than autoregressive alternatives. SoundStorm made the pipeline fast enough for real-time consumer deployment.

87.     In May 2023, Google moved quickly to product experimentation. Google made MusicLM available through its AI Test Kitchen on web, Android, and iOS, inviting users to generate music from prompts and provide preference feedback to help improve the model.[57] MusicLM was not merely an internal research prototype. It was deployed in a consumer-facing environment that captured real-world prompts, preferences, and usage patterns for iterative model refinement.

88.     This sequence of publications describes a coherent, deliberate build strategy: tokenize audio with a neural codec, train language-model-style generators over those tokens, add prompt conditioning through a large-scale

---

[56] Borsos, Zalan, "SoundStorm: Efficient Parralel Audio Generation", ArXiv, May 16, 2023, https://arxiv.org/abs/2305.09636

[57] Yim, Kristin, "Turn ideas into music with MusicLM", Google Blog, May 10, 2023, https://blog.google/innovation-and-ai/products/musiclm-google-ai-test-kitchen/

music-text embedding space trained on tens of millions of recordings, optimize generation speed for consumer deployment, and then ship the product. Each step was published by Google researchers, each step depended on copying and ingesting real recorded music at scale, and each step moved Google closer to the commercial music generator it now operates.

*YouTube-Scale Audio Infrastructure*

89.    Google's capacity to assemble music training corpora at this scale did not emerge in a vacuum. Long before Lyria, Google built public, YouTube-derived audio corpora and infrastructure that demonstrate the company's ability to locate, segment, label, and operationalize audio from YouTube at industrial scale.

90.    Google's AudioSet is a large-scale collection of human-labeled 10-second sound clips drawn from YouTube videos.[58] Google reports AudioSet contains over two million YouTube videos spanning 527 labels, with over one million videos labeled "Music."[59] Google distributes AudioSet as CSV[60] metadata identifying each segment by YouTube video ID and timestamps, together with pre-extracted audio features computed using models trained on a

---

[58] "A large-scale dataset of a manually annotated audio events", https://research.google.com/audioset/index.html

[59] Id.

[60] A CSV (Comma-Separated Values) file is a plain-text spreadsheet format in which each row represents a record and each value is separated by a comma. Google's distribution of AudioSet as CSV files means that anyone can download a structured index identifying each audio segment by its YouTube video ID and time markers, providing a ready-made roadmap for locating and extracting specific audio from YouTube at scale.

preliminary version of YouTube-8M, a separate Google dataset containing 6.1 million video IDs and 2.6 billion audio/visual features.[61] For MusicLM, Google created and released MusicCaps, a dataset of 5,521 music-text examples consisting of 10-second clips from AudioSet paired with detailed captions written by professional musicians.[62] MusicCaps is distributed as a CSV of YouTube video IDs and timestamps; Google's instructions state that to use MusicCaps, one must download the corresponding YouTube videos and clip them.[63]

91.     These datasets are not incidental research artifacts. They document that Google targets YouTube as a scalable source for audio extraction, has the tools to segment music from video with precision, and routinely converts those segments into machine-learning-ready corpora. When Google later describes training generative music systems on hundreds of thousands of hours of music, it is doing so against a backdrop of years of YouTube-scale audio mining that the company itself pioneered and published. That infrastructure is the backbone that enables rapid, large-scale corpus building. It also means Google can know, with granularity unmatched by any third party, what recordings are on the platform, how they are identified, and how they map to asserted ownership. These facts bear directly on Google's

---

[61] Id.

[62] "MusicCaps", Kaggle, https://www.kaggle.com/datasets/googleai/musiccaps

[63] Id.

knowledge, intent, and the reasonableness of any claim that the company could not have licensed the music it used.

*From Research to Commercial Product: Lyria*

92.     Google now presents Lyria as the commercial expression of this research lineage. Google DeepMind publicly introduced Lyria in November 2023, "in partnership with YouTube," announcing it alongside YouTube-facing AI experiments intended for use in the YouTube creator workflow, including Dream Track for Shorts and separate Music AI tools. Google's description sets the baseline for what Lyria is supposed to output: high-quality music "with instrumentals and vocals," transformation and continuation capabilities, and nuanced user control over style and performance.

93.     In 2026, Google presents Lyria as a deployed model family. DeepMind's public Lyria product page describes a "family of music generation models" that can create clips and tracks or provide a constant stream of music.[64] It identifies Lyria 3 for high-fidelity track generation, Lyria RealTime for real-time interactive generation, and a related open model release through Magenta. The public marketing for Lyria 3 emphasizes end use in real projects: DeepMind invites users to "export professional grade audio," describing output as "crisp, clear tracks ready for your projects," and highlights capabilities such as generating cohesive tracks, turning images into music, and controlling details like tempo, genre, and "realistic vocal styles."[65]

---

[64] https://deepmind.google/models/lyria/

[65] Id.

94. These published figures, 44 million clips for MuLan, five million clips and 280,000 hours for MusicLM, represent only the datasets Google documented publicly in research papers. On information and belief, the datasets used to train Lyria and its successors are substantially larger. Google's Lyria 3 model card[66] confirms that Lyria 3 "was trained on audio data" and that its "audio datasets were annotated with text captions at different levels of detail,"[67] but does not identify the recordings, their sources, or their volume. Google has never disclosed whose music is in the Lyria training data, who consented, or what licenses it claims authorize the use of copyrighted recordings at commercial scale.

*Google Knew Its Training Practices Created Legal Risks*

95. Google cannot credibly claim that it stumbled into the copyright issues raised by generative music. For years, Google and YouTube have publicly acknowledged that AI music tools pose serious risks to creators' rights and have publicly engaged with major rights holders about how those tools should be licensed and controlled. Google's research publications, industry negotiations, internal product decisions, and the fate of its researchers all

---

[66] A model card is a standardized disclosure document that accompanies a released AI model, describing its intended uses, training data, evaluation methods, known limitations, and ethical considerations. Google publishes model cards for its AI systems as a transparency measure. The Lyria 3 model card is significant because it confirms that Lyria 3 "was trained on audio data" and describes processing steps such as deduplication and quality filtering, while omitting the identity, source, and provenance of the recordings used.

[67] https://deepmind.google/models/model-cards/lyria-3/

reflect sustained awareness that training on copyrighted music without authorization creates serious legal exposure.

96.     That awareness appears as early as MusicLM. When Google completed MusicLM in early 2023, it withheld the model from public release. In the paper's broader impact discussion, Google expressly "acknowledge[d] the risk of potential misappropriation of creative content" associated with music generation, described conducting a memorization study, and stated it had "no plans to release models at this point."[68] Google also acknowledged that the system raised "concerns about cultural appropriation" and would "reflect the biases present in the training data."[69] Those admissions underscore that Google understood, at the research stage, the core problem: a generative music model trained at scale necessarily risks absorbing, reproducing, and commercializing protected expression from the recordings it ingests. Four months later, Google released MusicLM through its AI Test Kitchen anyway, inviting consumer feedback to improve the model.

97.     In August 2023, YouTube announced "AI music principles" and launched its Music AI Incubator in partnership with Universal Music Group.[70] YouTube positioned the program as an effort to "embrace" generative AI while

---

[68] Agostinelli, Andrea, et al., "MusicLM: Generating Music From Text", ArXiv, https://ar5iv.labs.arxiv.org/html/2301.11325

[69] Id.

[70] Mohan, Neal, "Our Principles For Partnering With The Music Industry on AI Technology", YouTube Official Blog, Aug. 21, 2023, https://blog.youtube/inside-youtube/partnering-with-the-music-industry-on-ai/

protecting artists and rights holders. The incubator was framed as an organized forum to gather feedback from artists, songwriters, producers, and rights holders on AI music tools developed at YouTube and Google. Public reporting that same month confirmed that Google and Universal Music were in talks regarding licensing structures for AI-generated songs and artist voice capabilities, including opt-in participation and compensation.[71] Google did not treat the licensing problem as speculative. It was already discussing AI music in terms of rights, royalties, and industry partnerships with the major labels. Independent artists were not at the table.

98.     In January 2024, trade reporting escalated further. Billboard reported, citing four independent sources with direct knowledge of label negotiations, that Google had trained its music model on a large set of music, including copyrighted major-label recordings, and then approached rights holders after the model was built rather than seeking permission first.[72] Sources familiar with the ensuing negotiations characterized the posture as one that disadvantaged rights holders because Google "had already taken what it wanted."[73] That reporting aligns with Plaintiffs' allegations here: a copy-first,

---

[71] Farah, Hibaq, "Google and Universal Music working on licensing voices for AI-generated songs", The Guardian, Aug. 9, 2023, https://www.theguardian.com/technology/2023/aug/09/google-and-universal-music-working-on-licensing-voices-for-ai-generated-songs

[72] Leight, Elias, "Google Trained AI On Copyrighted Music, Sources Say – Now It's Trying To Make Deals", Billboard, Jan. 25, 2024, https://www.billboard.com/pro/google-youtube-trained-ai-copyrighted-music-before-deals/

[73] Id.

negotiate-later strategy executed at scale by the company that owns the platform hosting the world's largest music catalog. If that is how Google handled the largest and most sophisticated players in the industry, independent artists like Plaintiffs had even less visibility, leverage, or protection.

99. Subsequent reporting reinforced that Google's internal teams understood the legal risk. In November 2024, Business Insider reported that Google DeepMind and YouTube had built an internal music-generation tool codenamed "Orca," explored revenue-sharing proposals with labels, and ultimately shelved the tool after encountering copyright and legal concerns.[74] Google's employees and industry counterparts recognized that the ability to generate realistic songs on demand, including in the style of known artists, creates an obvious collision with copyright and related rights. Google shelved one tool, and continued developing and deploying others.

100. By mid-2024, copyright litigation against other generative music companies was public and prominent. Major recording companies filed lawsuits against Suno and Udio, alleging that those companies trained music-generation systems on copyrighted recordings without authorization and generated outputs that could imitate protected works. Google monitored this landscape. It continued to build and deploy its music generators, including

---

[74] Langley, Hugh, "Google's DeepMind and YouTube built and shelved 'Orca,' a 'mind-blowing' music AI tool that hit a copyright snag", Business Insider, Nov. 21, 2024, https://www.businessinsider.com/google-deepmind-orca-ai-music-tool-copyright-issues-2024-11

expanding Lyria's distribution and integrating Lyria 3 into Gemini for mass-market use.

101.    Google's awareness is further confirmed by its researchers' experience. As alleged in ¶¶ 2–3 above, four researchers credited as core contributors to Lyria left Google DeepMind, formed a new company, and publicly launched Udio, another AI music-generation service allegedly trained on copyrighted recordings without authorization. In June 2024, the RIAA sued Udio for copyright infringement. In October 2025, Udio settled, agreeing to dismantle its existing system and rebuild using only licensed music. Google launched Lyria 2 while that lawsuit was pending. It launched Lyria 3 after the settlement, underscoring the legal risk of the very approach those researchers had developed at Google before departing to build Udio.

102.    Unlike third-party startups that must scrape or stream-rip music from external services, Google controlled one of the world's largest repositories and distribution channels for recorded music through YouTube. Google also built and operates the rights-management and enforcement systems that identify copyrighted works at scale and route monetization and takedown decisions. That control made Google's copying uniquely efficient and uniquely knowing. When Google extracted audio from YouTube-hosted recordings and used it for model development, it did so from within its own infrastructure and with access to the metadata and rights signals that accompany copyrighted uploads. This is not a case of accidental ingestion by a distant company operating in the dark. It is a case of deliberate copying by the platform operator

best positioned to know what was copyrighted, who owned it, and what permissions were required.

*Google Can Build Licensed Music-AI Products and Chose Not To for Lyria*

103.    Google has demonstrated that, when it chooses, it can curate a large music training corpus from authorized sources and describe that corpus publicly with specificity. In June 2025, Google's Magenta project published a research preview of Magenta RealTime, an open-weights[75] music generation model that Google describes as the "open-weights cousin" of Lyria RealTime, the real-time generative music model that powers MusicFX DJ and Google's real-time music API.[76] Google disclosed that Magenta RealTime is an 800-million-parameter autoregressive transformer model trained on approximately 190,000 hours of "stock music" from multiple sources, mostly instrumental.[77]

---

[75] "Open-weights" means Google publicly released the model's learned parameters, allowing anyone to download, run, and inspect the model. By contrast, Google has not released the weights for the Lyria models that power its commercial products. The distinction matters because Google's willingness to open-source a model trained on stock music, while keeping its copyrighted-music models proprietary, reflects a deliberate choice about which training data Google is willing to expose to public scrutiny.

[76] "Magenta RealTime: An Open-Weights Live Music Model", Magenta Blog, Jun. 20, 2025,  https://magenta.tensorflow.org/magenta-realtime

[77] Id. An autoregressive transformer model is a type of artificial intelligence system that generates output one piece at a time, with each new piece predicted based on everything that came before it. It is the same fundamental architecture behind large language models like ChatGPT and Google's Gemini. When applied to audio, the model generates music token by token in sequence, the same way a text model generates a sentence word by word.

Google released the model's code and weights on GitHub, Google Cloud Storage, and Hugging Face under permissive licenses.[78]

104.   These disclosures matter because they show that Google can assemble and describe a large music corpus, select a corpus it is willing to label publicly as "stock music," and distribute a model trained on that corpus under permissive licenses, while maintaining internal control over its flagship commercial offerings. By contrast, Google has not publicly identified the specific recordings and musical works used to train and refine the Lyria models deployed in its consumer and creator products. When asked about Lyria 3's training data, Google has stated only that it uses music it has "the right to use" under its "terms of service, partner agreements, and applicable law", without identifying a single agreement, a single license, or a single rights holder whose permission was obtained.[79] Google has offered generalized assurances about being "mindful" of copyright and partner agreements, without disclosing the copyrighted works it copied, the sources of those works, or the licenses it claims authorize their use at scale.

*Lyria 3 in Gemini and Mass-Market Deployment*

105.   On February 18, 2026, Google launched Lyria 3 inside the Gemini app, making its most advanced generative music model available to Gemini's

---

[78] Id.

[79] Stassen, Murray, "Google Acquires AI Music Platform – and Suno Challenger – ProducerAI", Music Business Worldwide, Feb. 24, 2026, https://www.musicbusinessworldwide.com/google-acquires-ai-music-platform-and-suno-challenger-producerai/

more than 750 million monthly active users. Lyria 3 generates short-form music tracks, currently up to 30 seconds, from natural-language prompts.[80] Users can describe a genre, mood, tempo, instrumentation, vocal style, or specific scenario, and Lyria 3 produces a finished audio clip with vocals, lyrics, instrumentals, harmonies, and backing vocals combined.[81]

106.   Lyria 3's vocal capabilities are central to its commercial pitch and to the harm alleged in this Complaint. Google markets Lyria 3 as capable of generating "realistic, natural, and nuanced" human voices.[82] Users can configure vocal characteristics by selecting from preset voice profiles with qualities described as "rich," "gravelly," "soulful," and "breathy," among others.[83] Users can specify male or female vocals, adjust vocal register, and shape the overall vocal texture of the output.[84] These are not generic synthesizer tones. Google is offering on-demand, configurable vocal performances designed to sound like real human singers, performances that, in a world without Lyria 3, would require hiring a vocalist, negotiating a session fee, and compensating the performer.

---

[80] Yawili, Joël, "A new way to express yourself: Gemini can now create music", Feb. 18, 2026, Google Blog, https://blog.google/innovation-and-ai/products/gemini-app/lyria-3/

[81] Id.

[82] https://deepmind.google/models/lyria/

[83] https://deepmind.google/models/lyria/prompt-guide/

[84] Id.

107.   Lyria 3 also generates original lyrics from prompts. Users can describe a lyrical theme, tone, or subject matter, and Lyria 3 generates sung lyrics that match the generated melody and vocal performance.[85] The system supports generation in at least eight languages.[86] By combining text-to-lyric and text-to-vocal generation with instrumental composition in a single model, Lyria 3 produces the functional equivalent of a fully performed and produced song, the same creative product that, historically, requires a songwriter, a vocalist, a producer, and a recording studio.

108.   Lyria 3 is available through multiple access tiers. In the free tier, users can generate a limited number of tracks per day. In Google's paid Gemini Advanced tier, users receive higher generation limits and additional features. This tiered structure means Lyria 3 is simultaneously a mass-market free tool that maximizes reach and a premium product that generates subscription revenue, both at the expense of the musicians whose works trained the underlying model.

109.   Google has publicly acknowledged that Lyria 3's outputs may contain protected expression. Google states that it has "filters in place to check outputs against existing content" but concedes that its approach "might not be foolproof." Google embeds SynthID[87], an imperceptible digital watermark, in

---

[85] https://deepmind.google/models/lyria/

[86] Id.

[87] Yawili, Joël, "A new way to express yourself: Gemini can now create music", Google Blog, Feb. 18, 2026, https://blog.google/innovation-and-ai/products/gemini-app/lyria-3/

generated audio, but SynthID is inaudible to listeners, undetectable without Google's proprietary tools, and does nothing to disclose that a track was generated by a system trained on copyrighted recordings. Google also operates a rights-holder reporting mechanism that allows copyright owners to flag outputs they believe infringe, which presupposes that infringing outputs will reach the public. These are not the safeguards of a company confident that its system produces only "original expression." They are acknowledgments that the system generates outputs containing recognizable elements of copyrighted works, paired with after-the-fact mechanisms that shift the burden of detection to the rights holders whose works were copied without permission in the first place.

*Dream Track: Artist Identity as a Product Feature*

110.   Before Lyria 3's mass-market launch, Google tested the commercial appeal of AI-generated music through Dream Track, a YouTube experiment that placed generative music directly into creator workflows. In November 2023, Google launched Dream Track for YouTube Shorts, allowing a limited set of creators to generate short music clips using AI-generated vocals modeled on nine participating artists, including Charli XCX, John Legend, Sia, T-Pain, and Troye Sivan.[88] Users selected an artist, typed a topic, and received a 30-second clip featuring an AI-generated vocal performance designed to

---

[88] Cohen, Lyor, and Reid, Toni, "An Early Look At The Possibilities As We Experiment With AI and Music", YouTube Official Blog, Nov. 16, 2023, https://blog.youtube/inside-youtube/ai-and-music-experiment/

sound like that artist, singing AI-generated lyrics over AI-generated instrumentation.[89]

111. Dream Track matters for two reasons beyond its immediate product significance. First, Google's product design demonstrates that artist identity is a core commercial input, not an incidental byproduct, of generative music. Google designed a user interface in which the first step is selecting an artist's name and likeness. The system then uses that identity to shape the output. This is not a system that happens to produce outputs reminiscent of known artists. It is a system built to do exactly that. Second, Dream Track taught consumers to associate Google's AI music products with real artists. Users who encountered Dream Track learned that Google's tools could generate music "by" a named artist, creating consumer expectations about the connection between AI-generated outputs and real musicians that persist even after the initial experiment.

112. With the launch of Lyria 3 in Gemini, Google expanded Dream Track beyond the original nine-artist experiment. Google announced that Lyria 3's vocal capabilities would allow creators to generate music with a wider range of vocal profiles and styles within YouTube Shorts workflows. Dream Track now operates as a feature embedded in YouTube's creator tools, placing AI-generated music directly alongside licensed music in the same content-creation environment where Plaintiffs' works are hosted and monetized.

---

[89] Id.

*ProducerAI: Full-Length Music as a Standalone Product*

113.   On February 24, 2026, one week after launching Lyria 3 in Gemini, Google launched ProducerAI, a standalone web-based platform for creating, sharing, and publishing AI-generated music.[90] ProducerAI represents the most direct commercial competitor to human-created music in Google's product lineup. While Lyria 3 in Gemini generates 30-second clips, ProducerAI is designed for full-length songs with "dynamic vocals" and professional production tools, including multi-stem arrangement and mixing capabilities.[91]

114.   ProducerAI is available on free and paid subscription plans. Its Terms of Service identify Google LLC as the service provider.[92] The platform allows users to create tracks, share them via link, and download finished audio files.[93] ProducerAI's interface displays the user's account name alongside generated tracks and tells users they "own" the output, assigning them rights to use, reproduce, and distribute the generated content.[94]

115.   ProducerAI's Terms of Service grant Google a perpetual, irrevocable, worldwide, royalty-free license to use content created on the platform for purposes including "to improve and develop" Google's products

---

[90] https://www.producer.ai/

[91] Id.

[92] https://www.producer.ai/terms

[93] https://support.google.com/gemini/answer/16901237?hl=en

[94] https://www.producer.ai/terms

and services, including AI and machine-learning technologies.[95] In other words, Google's product generates music trained on copyrighted recordings, then claims a perpetual license to reuse the outputs, including for further model training. The cycle is self-reinforcing: copy artists' works to build the model, use the model to generate new content, then use that content to further develop the model that copied the works in the first place.

116. ProducerAI's Privacy Notice is notable for what it discloses about voice processing. Google's privacy materials for ProducerAI state that voice-based features "may involve the extraction of a biometric voiceprint from a vocal recording."[96] Google defines "biometric voiceprint" in that context as a computational representation of the distinctive characteristics of a person's voice.[97] This disclosure confirms that Google's music-generation infrastructure is designed to isolate and process individual vocal characteristics as distinct computational objects, precisely the kind of processing that, when performed on copyrighted vocal performances during training, implicates the rights at issue in this case.

---

[95] Id.

[96] https://www.producer.ai/privacy

[97] Id. Just as a fingerprint captures the unique physical ridges of a person's finger, a voiceprint captures the measurable attributes that make one voice distinguishable from another, including pitch, tone, timbre, cadence, and articulation patterns. Illinois law classifies voiceprints as biometric identifiers subject to the protections of the Biometric Information Privacy Act.

117. ProducerAI also includes social and distribution features. Users can create "Spaces" to share and collaborate on AI-generated tracks. Generated music can be downloaded in standard audio formats and published or distributed through any channel the user chooses. Once a track leaves ProducerAI, it enters the same commercial ecosystem as human-created music, competing for listener attention, sync placements, and platform monetization, with no disclosure that the underlying system was built on copyrighted works and no indication that any artist endorsed, authorized, or was compensated for the output.

*Developer Access and Ecosystem Reach*

118. Google's generative music products are not limited to consumer-facing applications. Google also makes Lyria available to third-party developers through APIs and developer tools, extending the reach of its music-generation capabilities beyond Google's platforms.[98]

119. MusicFX DJ is a web-based tool built on Lyria RealTime, Google's real-time music generation model, that generates an infinite, evolving stream of music in response to user-adjustable parameters such as genre, energy, tempo, and instrumentation.[99] MusicFX DJ showcases Lyria RealTime's core

---

[98] https://deepmind.google/models/model-cards/lyria-3/. An API (Application Programming Interface) is a set of protocols that allows one software application to access the capabilities of another. A developer API makes those capabilities available to third-party application builders. When Google offers Lyria 3's music-generation capabilities through the Gemini API, any developer can integrate that capability into their own product, creating additional distribution channels for AI-generated music beyond Google's own consumer-facing products.

[99] https://deepmind.google/models/lyria/lyria-realtime/

capability: generating continuous music in real time, without a fixed endpoint, adapting to user input as it plays. The product is not a playlist or a jukebox. It is a live music generator that produces an unbounded stream of novel audio, replacing the need for a human DJ, a licensed music catalog, or a performance royalty.

120.    Google's Gemini API makes Lyria 3's music-generation capabilities available to third-party application developers through a standard API interface.[100] Developers can integrate Lyria 3's generation features into their own products and services, extending the distribution of AI-generated music far beyond Google's consumer platforms. Every third-party application built on the Gemini API becomes an additional distribution channel for music generated by a model trained on copyrighted recordings, multiplying the competitive harm and creating new vectors for the generation and distribution of outputs that may contain protected expression from Plaintiffs' works.

121.    Google's Music AI Sandbox provides a suite of AI-powered music creation and editing tools, including capabilities to create new clips, extend existing compositions, and edit musical passages, designed for use by working musicians and producers.[101] Google describes the Music AI Sandbox as tools for creating music and has presented it in conjunction with industry events

---

[100] https://deepmind.google/models/model-cards/lyria-3/

[101] Sethumadhavan, Arathi, "How Indian music legend Shankar Mahadevan experiments with Music AI Sandbox", Google Blog, https://blog.google/innovation-and-ai/products/lab-session-shankar-mahadevan/

and partnerships.[102] These tools are positioned not as consumer novelties but as professional creative instruments intended to integrate into the workflows of the same musicians whose copyrighted recordings trained the underlying models.

122. Taken together, Google's product ecosystem spans every commercially significant channel: mass-market consumer generation through Gemini, full-length professional music production through ProducerAI, creator-workflow integration through Dream Track on YouTube, real-time continuous generation through MusicFX DJ, third-party application development through the Gemini API, and professional music tools through Music AI Sandbox. Each product generates music from the same family of models, each model was trained on copyrighted recordings, and each deployment channel places AI-generated music into direct competition with the human-created music that made those models possible.

*Google Copied Plaintiffs' Works*

123. Google's published papers describe training on datasets derived from tens of millions of internet music videos hosted on platforms including YouTube. As alleged in ¶ 63, Plaintiffs' copyrighted recordings and compositions were available on YouTube during the periods in which Google assembled these training datasets, and Google disclosed no mechanism by which any artist could have excluded their works from the training pipeline.

---

[102] https://www.youtube.com/watch?v=-dPqc7l2zu8&t=5s

124.   On information and belief, Plaintiffs' copyrighted recordings, compositions, and lyrics are among the works Google ingested, copied, and commercially exploited. Google's MuLan dataset alone comprised approximately 44 million clips extracted from internet music videos. Google's MusicLM dataset comprised five million clips. The datasets used to train Lyria and its successors are, on information and belief, larger still. At these scales, the inclusion of commercially distributed recordings by working musicians is not speculative. It is the predictable and intended result of a pipeline designed to ingest music from the internet at an industrial scale, without exclusion filters and without consent mechanisms.

125.   Training and deploying modern generative models requires more than a single pass over training data. It requires persistent datasets, repeated access, and repeated copying for preprocessing, deduplication, filtering, evaluation, fine-tuning, red-teaming, and product iteration. On information and belief, Google's pipeline copied Plaintiffs' works, converted audio recordings and lyric text into machine-readable representations, and retained those representations, along with all derivative computational artifacts, for repeated use across successive model generations. Google's Lyria 3 model card describes training-data processing that includes "deduplication," "quality filtering," and "safety filtering"[103] — steps that require storing and repeatedly accessing copies of the underlying audio. Google also describes "supervised fine-tuning,"

---

[103] https://deepmind.google/models/model-cards/lyria-3/

"reinforcement learning from human and critic feedback," and continuous evaluations conducted by specialist teams outside the development group.[104] Each stage requires sampling from, comparing against, and reproducing the underlying audio corpora. The copies made to build the first Lyria model were stored in Google's systems, reused to train Lyria 2, reused again to train Lyria 3, and remain in Google's possession today.

*Google's Products Compete Directly in the Markets*
*Where Plaintiffs' Works Are Licensed and Monetized*

126.   Google reproduced Plaintiffs' copyrighted works when it copied them into its training corpora and pipelines. That reproduction, and Google's continued retention, processing, and commercial exploitation of those copies across successive model generations, is independently actionable under 17 U.S.C. § 106(1). Google's copying also causes concrete market harm because the product it built with those copies competes directly with the works it copied in the same markets for the same buyers.

127.   Google designed and deployed Lyria 3 to generate music, the same category of creative work as the copyrighted recordings and compositions it copied to build the system. Unlike a general-purpose language model that incidentally generates text, Lyria 3 is purpose-built to produce finished musical works: tracks with vocals, lyrics, instrumentals, and configurable production characteristics. Google markets these outputs for the same uses, and to the same buyers, as the music Plaintiffs create and license. The result is not

---

[104] Id.

incidental competition from a tool with a different purpose. It is direct,
designed-in market substitution at a scale that individual human creators
cannot match.

128.  Lyria 3 competes with Plaintiffs' works in the synchronization and
production music licensing markets. Thirty seconds, Lyria 3's current output
length, is the standard format of the sync licensing market: brand
advertisements, social media ads, podcast beds, video game ambient loops,
corporate presentations, and short-form video soundtracks. These are markets
where independent artists earn income that does not depend on streaming
volume, label backing, or touring. Buyers in these markets, including but not
limited to advertising agencies, content creators, podcasters, small businesses,
game developers, select music based on genre, mood, tempo, and
instrumentation. Lyria 3 generates music to those exact specifications, on
demand, for free. A buyer who would previously have licensed a track from a
production music library, a micro-sync catalog offering low-cost licenses for
short-form content, or directly from an independent artist can now generate a
functional equivalent in seconds, at no cost, through a platform with 750
million users.

129.  ProducerAI extends this competition to full-length recorded music.
Google markets ProducerAI for creating, publishing, and sharing "full-length
songs" with "dynamic vocals," the same format as the recordings Plaintiffs
distribute through streaming platforms and direct-to-fan channels. ProducerAI
is available globally with free and paid plans. It competes directly with the

56

markets for original recordings, commissioned compositions, session vocal work, and beat leasing where Plaintiffs' works generate revenue.

130. Google's control of YouTube amplifies the displacement. YouTube is simultaneously the platform where Plaintiffs distribute and monetize their music, the platform where creators generate AI music through Dream Track, and the platform whose recommendation algorithms determine which music, human-created or AI-generated, reaches listeners. When the same company that hosts the licensed catalog also supplies a free substitute and controls the algorithm that mediates between them, the structural harm to human creators is not hypothetical. It is architectural.

131. Lyria 3 also competes in the markets for vocal performance and lyric writing. As described in ¶¶ 106–107, Google markets Lyria 3's vocal capabilities as generating "realistic, natural, and nuanced" human voices with configurable characteristics, and its lyric-generation features as producing sung lyrics on demand in at least eight languages. These capabilities compete directly with the markets for session vocalists, commissioned vocal arrangements, and lyric licensing, markets that represent a significant share of independent artists' professional income.

132. Google's products generate these competing works because they were trained on copyrighted music. An AI music generator trained only on public-domain recordings or stock music would not produce outputs with the stylistic range, genre fluency, vocal realism, or production quality that Google markets as Lyria 3's distinguishing features. Google's conduct confirms this. As

described in ¶¶ 103–104, when Google built Magenta RealTime on approximately 190,000 hours of stock music, it did not market the outputs as "professional-grade" or "realistic," and it described them as "mostly instrumental." Lyria 3, trained on copyrighted recordings, produces vocal, lyrical, multi-genre outputs that Google markets as "high-fidelity" and "professional-grade." The proper comparison is not between a world with Lyria 3 and a world without AI music generation. It is between a world in which Google trained Lyria 3 on Plaintiffs' copyrighted works and a world in which it did not. The difference in output quality is the measure of the competitive advantage Google extracted from Plaintiffs' works, and the market harm to Plaintiffs flows from that advantage.

133.   That harm is amplified by the economics of AI-generated music. Lyria 3 produces unlimited outputs at near-zero marginal cost. Each output is a potential substitute for a licensed track that currently commands a price. When a free substitute is available on demand at the scale of Google's deployment, the predictable result is downward pressure on licensing rates across every market segment where AI-generated music is a functional alternative, including the sync, production, and short-form video markets that are central to independent artists' livelihoods.

*Google's Pipeline Strips Copyright Management Information*

134.   On information and belief, Google's training pipeline removes, alters, or renders unreadable copyright management information from the works it processes. When recorded music is distributed commercially, it carries

embedded metadata identifying the work and its owner, including artist names, track titles, ISRC codes, label and publisher designations, and copyright notices. When Google extracts audio from source files, converts it into standardized formats, segments it into clips, and transforms it into tokenized representations for model training, that metadata is stripped away. The expressive content of the recording is preserved; the information identifying it as someone's property is not.

135. Google's lyric-generation capabilities implicate the same concern. On information and belief, Google trained Lyria 3's lyric-generation and vocal-alignment features using copyrighted lyrical works and associated text, ingested and processed in ways that discard or disassociate title, author, and publisher information from the underlying works.

136. Google then distributes AI-generated outputs that lack attribution to the copyrighted works used to build the system. As described in ¶ 109, SynthID watermarking identifies outputs as AI-generated but does not identify the works that were copied during training, does not restore the CMI removed during ingestion, and does not cure the violations that occurred when that information was stripped.

*Technological Measures*

137. On information and belief, Google obtained recordings and lyric text used in its training pipeline from sources protected by technological access controls, including encryption, paywalls, API restrictions, and streaming DRM. On information and belief, Google bypassed or avoided such measures to

obtain copies suitable for large-scale ingestion and training, in violation of 17 U.S.C. § 1201.

## CLASS ACTION ALLEGATIONS

138.   Plaintiffs bring this action pursuant to Federal Rule of Civil Procedure 23 on behalf of themselves and all other similarly situated persons and entities ("Class Members"). As used herein, "independent artists" broadly includes all individuals, entities, or rights holders — whether artists, musicians, songwriters, producers, estates, heirs, independent labels, or other persons — who create, perform, produce, or own exclusive rights in (a) sound recordings, (b) musical compositions (including melodic, harmonic, rhythmic, and structural expression and fixed arrangements), and/or (c) the lyrics or other textual elements of musical compositions.

139.   The "Class Period" means the period beginning on the earliest date Google or its agents copied, ingested, or otherwise reproduced any Class Member's work for use in connection with the development, training, fine-tuning, evaluation, or operation of Google's generative music systems, and continuing through the date of final judgment or class notice. Plaintiffs reserve all rights under applicable statutes of limitations, accrual principles, and tolling doctrines, including the discovery rule, continuing-violation principles, fraudulent concealment, and equitable tolling, and do not waive any argument that the Class Period extends further than discovery ultimately establishes.

140.   Plaintiffs seek certification of the following nationwide classes and subclasses:

(a) *Sound Recording Copyright Class (Registered).* All independent artists in the United States who own or exclusively control registered U.S. copyrights in sound recordings fixed on or after February 15, 1972, that appear in any dataset or pipeline Google copied, ingested, or used to develop, train, fine-tune, evaluate, or operate its generative music systems during the Class Period, excluding works Google used pursuant to a written license or agreement that expressly authorized Google's use of the recording for training or operating generative music systems.

(b) *Sound Recording Copyright Class (Previously Unregistered).* All independent artists in the United States who own or exclusively control copyrights in original sound recordings that were unregistered with the U.S. Copyright Office at the time Google copied, ingested, or used them during the Class Period, excluding works Google used pursuant to a written license or agreement that expressly authorized Google's use of the recording for training or operating generative music systems.

(c) *Lyrics Copyright Subclass (Registered).* All independent artists in the United States who own or exclusively control registered U.S. copyrights in the lyrics or textual portions of musical compositions that appear in any dataset or pipeline Google copied, ingested, or used to develop, train, fine-tune, evaluate, or operate its generative music systems during the Class Period, excluding works Google used pursuant to a written license or agreement that expressly authorized Google's use of the lyrics for training or operating generative music systems.

61

(d) *Lyrics Copyright Subclass (Previously Unregistered).* All independent artists in the United States who own or exclusively control copyrights in the lyrics or textual portions of musical compositions that were unregistered with the U.S. Copyright Office at the time Google copied, ingested, or used them during the Class Period, excluding works Google used pursuant to a written license or agreement that expressly authorized Google's use of the lyrics for training or operating generative music systems.

(e) *Musical-Composition (Non-Lyric) Subclass (Registered).* All persons or entities who, during the Class Period, owned or exclusively controlled registered U.S. copyrights in the non-lyric elements of musical compositions — including melodic, harmonic, rhythmic, and structural expression and fixed arrangements — that appear in any dataset or pipeline Google copied, ingested, or used to develop, train, fine-tune, evaluate, or operate its generative music systems, excluding works Google used pursuant to a written license or agreement that expressly authorized Google's use of the composition for training or operating generative music systems.

(f) *Musical-Composition (Non-Lyric) Subclass (Previously Unregistered).* All persons or entities who, during the Class Period, owned or exclusively controlled copyrights in the non-lyric elements of musical compositions that were unregistered with the U.S. Copyright Office at the time Google copied, ingested, or used them, excluding works Google used pursuant to a written license or agreement that expressly authorized Google's use of the composition for training or operating generative music systems.

62

(g) *DMCA CMI Subclass.* All independent artists in the United States whose copyrighted sound recordings, musical compositions, and/or lyrics contained copyright management information at or before Google's acquisition, copying, or processing, and that Google copied, ingested, or processed during the Class Period, excluding works Google used pursuant to a written license or agreement that expressly authorized Google's use of the work for training or operating generative music systems.

(h) *DMCA Anti-Circumvention Subclass.* All independent artists in the United States who own or exclusively control copyrights in sound recordings, musical compositions, and/or lyrics that, at the time Google or its agents acquired or accessed them, were distributed through third-party digital platforms or services — including but not limited to Apple Music, Spotify, Tidal, Amazon Music, and Deezer — employing technological measures that effectively control access to or protect rights in the works, and that Google or its agents acquired, accessed, or copied during the Class Period by circumventing, bypassing, or defeating such technological measures without the authorization of the copyright owner, excluding works Google used pursuant to a written license or agreement that expressly authorized Google's use of the work for training or operating generative music systems.

(i) *False Endorsement Subclass (Lanham Act § 43(a)(1)(A)).* All independent artists in the United States who, during the Class Period, owned or controlled an artist identifier — including a name, stage name, pseudonym, trademark, service mark, or distinctive producer or artist tag — and whose

63

artist identifier was used, referenced, or invoked in connection with Google's advertising, promotion, or provision of its generative music services without a written license or consent authorizing such use during the Class Period.

(j) *False Advertising Subclass (Lanham Act § 43(a)(1)(B)).* All independent artists in the United States who, during the Class Period, owned or exclusively controlled rights in at least one sound recording and/or musical composition, and who received revenue in the United States during the Class Period from licensing, commissioning, or commercial exploitation of recorded music and/or musical compositions in markets where Google's generative music products compete, including synchronization licensing, production or library music licensing, and commissioned music, songwriting, production, or vocal performance services, excluding any person or entity that executed a written agreement with Google during the Class Period expressly authorizing Google to use that person's or entity's works in connection with Google's generative music systems and related advertising or promotion.

(k) *Illinois BIPA Subclass.* All natural persons residing in Illinois who created or performed sound recordings containing distinctive vocal performances from which Google collected, captured, obtained, stored, or used voiceprints or biometric voice identifiers in connection with its generative music systems and related products, without obtaining informed written consent as required under 740 ILCS 14/15.

(l) *Illinois Right of Publicity Subclass.* All natural persons who are Illinois residents and/or whose identities — including name, voice, signature,

64

photograph, image, or likeness — were used by Google for a "commercial purpose" in Illinois without prior written consent, by reproducing, synthesizing, or simulating their distinctive voices or vocal signatures in Google-generated outputs, and/or by using their names, voices, or other identifying attributes to advertise, market, or promote Google's products or services.

(m) *Illinois UDTPA Subclass (injunctive relief only).* All Illinois-resident members of any Class or Subclass defined herein who seek injunctive relief under 815 ILCS 510/3.

(n) *Illinois Unjust Enrichment Subclass.* All Illinois-resident owners of relevant rights whose works, likenesses, or voiceprints appear in any dataset or pipeline Google copied, ingested, or used to develop, train, fine-tune, evaluate, or operate its generative music systems during the Class Period.

(o) *Illinois Consumer Fraud Subclass (ICFA).* All independent artists who are natural persons residing in Illinois, or entities organized under Illinois law or maintaining their principal place of business in Illinois, and who during the Class Period owned or exclusively controlled rights in sound recordings, musical compositions, or lyrics that appear in any dataset or pipeline Google copied, ingested, or used to develop, train, fine-tune, evaluate, or operate its generative music systems, excluding works Google used pursuant to a written license or agreement that expressly authorized Google's use of the work for training or operating generative music systems.

141. Excluded from all Classes and Subclasses are: (i) Google LLC, Alphabet Inc., and each of their parents, subsidiaries, affiliates, and controlled

65

entities; (ii) all current and former officers and directors of Google and Alphabet; (iii) Google's and Alphabet's employees, contractors, agents, and counsel; (iv) the Court, the Court's staff, and any jurors assigned to this action; and (v) the immediate family members of any excluded person. Also excluded are any persons or entities that entered into a written license or agreement that expressly authorized Google's use of the relevant work for training or operating generative music systems during the Class Period.

142. Plaintiffs reserve the right to amend or refine Class and Subclass definitions in light of discovery, further investigation, and evidence produced in this case. Nothing in any Class or Subclass definition limits or disclaims claims or remedies available under any statute asserted in this Complaint. References to registration status in the Copyright Act class and subclass definitions reflect the requirements of 17 U.S.C. § 412 and do not affect the availability of statutory damages, liquidated damages, or attorneys' fees under any other statute.

143. *Ascertainability.* Class membership is defined by objective criteria and can be determined through records that exist or will be produced in discovery. Whether a specific work appears in a dataset Google used for training is a binary factual question: the work is either in the dataset or it is not. Google maintains the records that answer that question, including dataset manifests, ingestion logs, pipeline metadata, training data indices, and associated provenance records. Class membership can be further confirmed through U.S. Copyright Office registration records, standard music-industry

identifiers (ISRC, ISWC, UPC)[105], distributor and aggregator metadata, and Content ID reference-file records that Google itself maintains. To the extent Google contends that class membership cannot be determined, that contention reflects Google's choice not to disclose the contents of its training data, a choice that cannot be rewarded by denying certification to the class of artists whose works Google copied.

144. *Numerosity.* Each proposed Class and Subclass consists of thousands of independent artists nationwide, including a significant number within Illinois, making joinder of all members impracticable. Google's own published research describes training on datasets comprising tens of millions of recordings. The number of independent artists whose works appear in those datasets far exceeds the threshold for numerosity under Rule 23(a)(1).

145. *Commonality.* Common questions of law and fact predominate because Google's challenged conduct was uniform, automated, and applied identically to all works that entered its pipeline. The central factual questions — what Google copied, how it processed what it copied, what it built with those copies, and how it deployed the resulting products — are answerable on a

---

[105] ISRC (International Standard Recording Code) is a unique identifier assigned to individual sound recordings, used to track recordings across platforms and manage royalty distributions. ISWC (International Standard Musical Work Code) is the corresponding identifier for musical compositions, linking a composition to its authors and publishers regardless of how many recordings of that composition exist. UPC (Universal Product Code) identifies a specific commercial release, such as an album, EP, or single, as a product in the marketplace. Together, these identifiers form the backbone of digital music rights management: the ISRC identifies the recording, the ISWC identifies the underlying composition, and the UPC identifies the release. Each is embedded in or associated with the metadata that accompanies commercially distributed music, and each connects a work to the rights holders entitled to compensation when it is used.

class-wide basis from Google's own records, publications, and product documentation. These common questions include:

(a) Whether Google reproduced Class Members' copyrighted works by copying them into datasets and pipelines used to develop, train, fine-tune, evaluate, or operate its generative music systems, and whether that reproduction infringed the exclusive rights secured by 17 U.S.C. § 106;

(b) Whether Google's conduct constitutes fair use under 17 U.S.C. § 107, including whether Google's use has the same purpose as the copied works, whether training on copyrighted music made Google's products meaningfully more competitive than a product trained on licensed or public-domain music, and whether Google's deployment causes or threatens market substitution;

(c) Whether Google distributed copies of Class Members' works to vendors, contractors, and third parties as part of its data preparation, labeling, evaluation, and product deployment workflows;

(d) Whether Google removed, altered, or rendered unreadable copyright management information from Class Members' works during acquisition, conversion, and processing, and whether Google provided or distributed false CMI in connection with AI-generated outputs, in violation of 17 U.S.C. § 1202;

(e) Whether Google or its agents circumvented technological access controls to obtain copies of Class Members' works from third-party platforms, in violation of 17 U.S.C. § 1201;

(f) Whether Google collected, captured, obtained, stored, or used Illinois residents' voiceprints or biometric voice identifiers without the notice, written policy, and informed written consent BIPA requires;

(g) Whether Google used Illinois residents' identities for commercial purposes without written consent, in violation of the Illinois Right of Publicity Act;

(h) Whether Google's marketing and distribution of its generative music products, and its ownership messaging and omissions regarding the provenance and legal status of AI-generated outputs, constitute deceptive trade practices or unfair acts under the Illinois UDTPA and ICFA;

(i) Whether Google's conduct was willful, intentional, or reckless for purposes of enhanced remedies; and

(j) Whether class-wide injunctive and declaratory relief is appropriate to halt ongoing infringement and prevent further irreparable harm.

146. *Typicality.* Plaintiffs' claims are typical of the claims of all Class Members. Plaintiffs are independent artists whose copyrighted works were, on information and belief, copied and processed through the same automated pipeline, used to train the same models, and deployed through the same commercial products as the works of all other Class Members. The injuries Plaintiffs suffered, including but not limited to unauthorized reproduction, loss of licensing revenue, market displacement, and loss of control over their works, arise from the same uniform course of conduct and are identical in kind to the injuries suffered by the class.

147. *Adequacy.* Plaintiffs are adequate class representatives. Their interests are aligned with, and not antagonistic to, the interests of the Class. Plaintiffs have retained counsel experienced in complex copyright and Lanham Act litigation, DMCA enforcement, biometric privacy, and class action practice. Plaintiffs and their counsel will vigorously prosecute this action on behalf of the class.

148. *Predominance and Superiority.* Common questions predominate over any individualized questions. Google's training pipeline is a uniform, automated system that processes all ingested works through the same stages, including acquisition, conversion, segmentation, tokenization, training, evaluation, and deployment. Whether any individual work was processed through that pipeline is a binary question answerable from Google's records. Copyright ownership for sound recordings is determinable through registration records, distributor agreements, and standard industry metadata. The market harm alleged is structural and class-wide: every Class Member competes in the same markets that Google's products are designed to displace. Individual damages calculations, to the extent they become necessary, are appropriately reserved for a damages phase and do not defeat predominance. *See Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013).

149. Class-wide adjudication is superior to individual litigation. The statutory and actual damages available to any individual independent artist, while significant in aggregate, may be individually insufficient to justify the cost of federal litigation against one of the world's largest technology companies.

70

Individual litigation would also risk inconsistent adjudications of identical questions regarding Google's conduct. Class treatment is particularly appropriate because Google's pipeline is standardized and its products are deployed uniformly, making individualized factual inquiries unnecessary for resolving the common questions that drive liability.

150. *Injunctive and Declaratory Relief.* Google has acted on grounds generally applicable to the entire class, making final injunctive and declaratory relief appropriate for the class as a whole under Rule 23(b)(2). Absent class-wide relief, Google's unauthorized copying, retention, and commercial exploitation will continue, causing irreparable harm to Plaintiffs and all Class Members that individual actions cannot remedy.

## CLAIMS FOR RELIEF

### Count I

### Direct Copyright Infringement, Reproduction of Sound Recordings, 17 U.S.C. § 501

*Brought on behalf of the Sound Recording Copyright Class (Registered) and Sound Recording Copyright Class (Previously Unregistered)*

151. Plaintiffs reallege and incorporate by reference all allegations in this complaint.

152. Plaintiffs Woulard, ATS, the Burjek Plaintiffs, the Directrix Plaintiffs, Fiennes, Mell, and Kogon bring this Count individually and on behalf of the *Sound Recording Copyright Class (Registered)* and the *Sound Recording Copyright Class (Previously Unregistered)* for direct infringement of the reproduction right under 17 U.S.C. § 106(1).

71

153.   Plaintiffs and Class Members own or exclusively control copyrights in original sound recordings. The registered works identified in Exhibit A are properly registered with the U.S. Copyright Office. Previously unregistered works are original works of authorship fixed in a tangible medium and protected by copyright upon fixation. This Count is brought only with respect to works for which the registration prerequisite of 17 U.S.C. § 411(a) is satisfied or does not apply, including works for which registration has been granted or refused as of the filing of this action, and works that are not "United States works" within the meaning of the Copyright Act.

154.   Without authorization, Google reproduced Plaintiffs' and Class Members' copyrighted sound recordings by copying them into datasets and pipelines used to develop, train, fine-tune, evaluate, and operate its generative music systems. On information and belief, Google's reproduction occurred through a standardized pipeline that included acquisition and extraction of audio into Google-controlled systems, conversion into internal formats, segmentation into clips, tokenization into model-ready representations, and storage in centralized repositories used across multiple training runs, model versions, evaluations, and product iterations. Each stage of copying constitutes an independent act of unauthorized reproduction.

155.   On information and belief, Google's reproduction was not limited to a single training event. Google retained and repeatedly accessed copied recordings and derivative representations for engineering and product workflows including deduplication, quality filtering, safety review, evaluation,

72

regression testing, fine-tuning, and iterative refinement across successive model generations. Each such reuse involved additional unauthorized reproductions.

156. Google's infringement was willful. Google operates the world's largest music distribution platform and the Content ID rights-management system, giving it unmatched knowledge of the copyright status and ownership of the recordings it copied. Google's own researchers acknowledged the "risk of potential misappropriation of creative content."[106] Google proceeded to copy, retain, and commercially exploit copyrighted sound recordings without authorization.

157. As a direct and proximate result of Google's infringement, Plaintiffs and Class Members have suffered and continue to suffer harm, including unauthorized reproduction of their works, loss of licensing revenue, market displacement, and loss of control over their creative works.

158. Plaintiffs and the *Sound Recording Copyright Class (Registered)* seek statutory damages under 17 U.S.C. § 504(c), or in the alternative actual damages and Google's profits under § 504(b), injunctive relief under § 502, and costs and attorneys' fees under § 505. Plaintiffs and the *Sound Recording Copyright Class (Previously Unregistered)* seek actual damages and Google's profits under § 504(b) and injunctive relief under § 502, and do not seek statutory damages or attorneys' fees for any work where such relief is

---

[106] Agostinelli, Andrea, et al., "MusicLM: Generating Music From Text", ArXiv, https://ar5iv.labs.arxiv.org/html/2301.11325

unavailable under § 412. For any work encompassed by this Count that was unregistered at the time of filing, Plaintiffs have filed or will promptly file registration applications and will supplement this pleading upon issuance.

## Count II

### Direct Copyright Infringement, Distribution of Sound Recordings, 17 U.S.C. §501

*Brought on behalf of the Sound Recording Copyright Class (Registered) and Sound Recording Copyright Class (Previously Unregistered)*

159.   Plaintiffs reallege and incorporate by reference all allegations in this complaint.

160.   Plaintiffs Woulard, ATS, the Burjek Plaintiffs, the Directrix Plaintiffs, Fiennes, Mell, and Kogon bring this Count individually and on behalf of the *Sound Recording Copyright Classes* for direct infringement of the distribution right under 17 U.S.C. § 106(3).

161.   Under 17 U.S.C. § 106(3), Plaintiffs and Class Members have the exclusive right to distribute copies or phonorecords of their copyrighted sound recordings. Reproduction and distribution are independent exclusive rights, and this Count is pleaded independently of Count I.

162.   On information and belief, Google distributed unauthorized copies of Plaintiffs' and Class Members' copyrighted sound recordings to third parties as part of its data preparation, labeling, evaluation, and product deployment workflows. Google's distributions included providing access to or transmitting audio recordings, clipped segments, or derivative representations to vendors, contractors, and service providers engaged in captioning, labeling, quality

74

review, safety review, evaluation, red-teaming, and related tasks. Google's Lyria 3 model card describes evaluations conducted by "specialist teams outside the model development group" and "human red teaming," processes that necessarily involve sharing copies of audio data with persons outside the core development team.[107]

163.   Plaintiffs allege distribution on information and belief because the specific recipients, mechanisms, and volumes of Google's transfers are uniquely within Google's possession and are expected to be confirmed through discovery. In the alternative, each transfer to a third party created at least one additional unauthorized server-side copy, independently violating § 106(1).

164.   Plaintiffs seek all relief available under the Copyright Act, including statutory damages or actual damages and profits, injunctive relief, and costs and attorneys' fees, on the same terms as set forth in Count I.

**Count III**

**Direct Copyright Infringement, Reproduction of Lyrics,<br>17 U.S.C. §501**

*Brought on behalf of the Lyrics Copyright Subclass (Registered)<br>and Lyrics Copyright Subclass (Previously Unregistered)*

165.   Plaintiffs reallege and incorporate by reference all allegations in this complaint.

---

[107] Red-teaming is an adversarial testing practice in which designated evaluators deliberately attempt to provoke a system into producing harmful, infringing, or otherwise problematic outputs. Red-teaming necessarily involves providing the testers with access to the system and, in the case of music-generation models, to the underlying audio data and outputs.

166.   Plaintiffs Woulard, ATS, the Burjek Plaintiffs, the Directrix Plaintiffs, Fiennes, Mell, and Kogon bring this Count individually and on behalf of the *Lyrics Copyright Subclasses* for direct infringement of the reproduction right under 17 U.S.C. § 106(1), based on Google's unauthorized copying, storage, and use of copyrighted lyrics in connection with its generative music systems.

167.   Plaintiffs and Class Members own or exclusively control copyrights in the lyrics or textual portions of musical compositions. This Count is brought only with respect to works for which the registration prerequisite of 17 U.S.C. § 411(a) is satisfied or does not apply.

168.   Google's music-generation systems are expressly designed to generate lyrical text, align lyrics with music and vocal performance, and provide user controls over lyrical content. On information and belief, Google could not have built these capabilities without copying, ingesting, and training on massive quantities of copyrighted lyrical works, including Plaintiffs' and Class Members' lyrics.

169.   Without authorization, Google reproduced Plaintiffs' and Class Members' copyrighted lyrics by copying them into datasets and pipelines and retaining them for use across training, fine-tuning, alignment, evaluation, and product iteration. Each such reproduction constitutes an independent act of infringement.

170. Google's infringement was willful. Google designed and marketed a commercial product that generates lyrics on demand while withholding the contents and provenance of the lyric data used to build that capability.

171. As a direct and proximate result, Plaintiffs and Class Members have suffered and continue to suffer harm, including unauthorized reproduction of their lyrical works, lost licensing revenue, and market displacement in lyrics-dependent markets including synchronization, commissioned writing, and lyric display licensing.

172. Plaintiffs and the *Lyrics Copyright Subclass (Registered)* seek statutory damages or actual damages and profits, injunctive relief, and costs and attorneys' fees. Plaintiffs and the *Lyrics Copyright Subclass (Previously Unregistered)* seek actual damages and profits and injunctive relief, and do not seek statutory damages or attorneys' fees where unavailable under § 412. Plaintiffs will supplement this pleading with registration details upon issuance.

### Count IV

### Direct Copyright Infringement, Reproduction of Musical-Compositions, Non-Lyric, 17 U.S.C. §501

*Brought on behalf of the Musical-Composition (Non-Lyric) Subclass (Registered) and Musical-Composition (Non-Lyric) Subclass (Previously Unregistered)*

173. Plaintiffs reallege and incorporate by reference all allegations in this complaint.

174. Plaintiffs Woulard, ATS, the Burjek Plaintiffs, the Directrix Plaintiffs, Fiennes, Mell, and Kogon bring this Count individually and on behalf of the *Musical-Composition (Non-Lyric) Subclasses* for direct infringement of the

reproduction right under 17 U.S.C. § 106(1), based on Google's unauthorized copying and use of musical compositions, including protectable melodic, harmonic, rhythmic, and structural expression and fixed arrangements, in connection with its generative music systems.

175. Plaintiffs and Class Members own or exclusively control copyrights in the musical compositions at issue. This Count is brought only with respect to works for which the registration prerequisite of § 411(a) is satisfied or does not apply.

176. The Copyright Act protects musical composition expression independently of any particular sound recording. Google reproduced Plaintiffs' and Class Members' protected composition expression by copying sound recordings that embody those compositions, converting them into machine-readable representations that retain the melodic, harmonic, rhythmic, and structural content of the compositions, and using those representations to train generators designed to produce new music exhibiting the same categories of musical expression.

177. Without authorization, Google reproduced these compositions through the same standardized pipeline alleged in Count I, and retained and reused them across successive model generations. Each act of copying, retention, and reuse constitutes an independent infringement.

178. Additionally, Google designed its systems to generate new musical works exhibiting the same categories of compositional expression — melody, harmony, rhythm, structure, and arrangement — that it copied from Plaintiffs'

78

and Class Members' compositions. To the extent those outputs incorporate, recast, or transform protected compositional elements from Plaintiffs' works, each such output constitutes an unauthorized derivative work under 17 U.S.C. § 106(2). This theory of liability is independent of, and in addition to, the reproduction theory alleged above.

179. Google's infringement was willful, for the reasons stated in Count I.

180. As a direct and proximate result, Plaintiffs and Class Members have suffered and continue to suffer harm, including unauthorized reproduction of their compositional expression, lost licensing revenue, and market displacement in synchronization and production music markets.

181. Relief is sought on the same terms as Counts I and III, with statutory damages available for registered works and actual damages and profits for previously unregistered works.

## Count V

### Removal or Alteration of Copyright Management Information
### 17 U.S.C. § 1202(b)

*Brought on behalf of the DMCA CMI Subclass, Lyrics Copyright Subclasses, and Musical-Composition (Non-Lyric) Subclasses*

182. Plaintiffs reallege and incorporate by reference all allegations in this complaint.

183. Section 1202(b) of the DMCA prohibits intentionally removing or altering copyright management information, and distributing works knowing that CMI has been removed or altered, when the defendant knows or has reasonable grounds to know that the removal or alteration will induce, enable,

facilitate, or conceal infringement. CMI includes, among other things, titles, author names, copyright owner names, terms and conditions for use, and identifying numbers or symbols such as ISRC and ISWC codes. 17 U.S.C. § 1202(b)–(c).

184. Plaintiffs' and Class Members' works contained CMI at or before Google's acquisition and processing. Sound recordings are distributed with embedded metadata including artist name, track title, album information, credits, copyright notices, and unique identifiers. Musical compositions and lyrics carry identifying information about title, author, publisher, and ownership.

185. On information and belief, Google removed, altered, or rendered unreadable CMI from Plaintiffs' and Class Members' works during acquisition, conversion, segmentation, and ingestion into its training pipelines. Google converted source media into internal formats and model-ready representations in ways that strip embedded metadata and sever the association between a work and its identifying information, preserving expressive content while eliminating attribution and ownership signals.

186. On information and belief, Google further distributed copies of works with CMI removed or altered to vendors, contractors, and service providers engaged in labeling, evaluation, filtering, and red-teaming for its music-generation systems.

187. Google knew or had reasonable grounds to know that removing CMI would induce, enable, facilitate, or conceal infringement. Stripping

attribution and ownership information impedes creators' ability to identify and trace copied works within training corpora, frustrates licensing and enforcement, and facilitates Google's continued reuse and redistribution of copied content without accountability.

188.   Google's violations were willful. Google operates Content ID, a system built on the principle that ownership metadata must accompany music to enable rights management, and nevertheless designed a training pipeline that systematically removes that metadata at scale.

189.   Plaintiffs seek all remedies available under 17 U.S.C. § 1203, including statutory damages, injunctive relief, costs, and attorneys' fees.

## Count VI

## Circumvention of Technological Access Controls, 17 U.S.C. §1201

*Brought on behalf of the DMCA Anti-Circumvention Subclass*

190.   Plaintiffs reallege and incorporate by reference all allegations in this complaint.

191.   Section 1201 of the DMCA prohibits circumventing technological measures that effectively control access to copyrighted works, and trafficking in technologies designed to circumvent such measures. 17 U.S.C. § 1201(a)(1)–(2), (b)(1).

192.   Copyright owners deploy technological access controls on licensed digital platforms — including Apple Music, Spotify, Tidal, Amazon Music, and Deezer — that effectively control access to commercially released sound recordings and associated lyrical content. These measures include digital-

rights-management systems, session-keyed streaming encryption, platform-specific authentication, and download-prevention architectures.

193.   On information and belief, during the Class Period, Google and/or its data vendors and agents acquired recordings by circumventing these platform-deployed access controls without the authority of the copyright owners. On information and belief, Google and/or its agents deployed or procured automated tools capable of resolving platform-specific session keys, authentication tokens, or DRM encryption to extract decrypted audio streams, and converted the resulting files to unprotected formats for storage and processing in Google's training pipeline.[108]

194.   On information and belief, Google also procured or coordinated with third-party data vendors or intermediaries that trafficked in circumvention technologies and provided Google with decrypted audio at scale, or with services designed to defeat access controls on licensed platforms. Google knew or had reason to know that the audio it received had been obtained through circumvention.

195.   Google's conduct was knowing and willful. Google possesses deep expertise in streaming-media security and content-protection technologies. No

---

[108] Digital Rights Management (DRM) encryption refers to technological protection measures that control access to copyrighted content on streaming platforms. When a consumer streams a song on Spotify, Apple Music, or Tidal, the audio is delivered in an encrypted format that permits playback through the platform's authorized application but prevents the listener from extracting or saving a usable audio file. Rights holders license their recordings to these platforms on the condition that DRM will prevent unauthorized copying. Circumventing DRM to extract decrypted audio defeats the access controls that rights holders required as a condition of distribution.

statutory exemption applies to Google's commercial acquisition of training data at an industrial scale.

196. Plaintiffs seek all remedies available under 17 U.S.C. § 1203, including statutory damages, injunctive relief requiring deletion of circumvention-obtained copies, impoundment and destruction of circumvention tools, costs, and attorneys' fees.

**Count VII**

**False Copyright Management Information,**

**17 U.S.C. § 1202(a)**

*Brought on behalf of the DMCA CMI Subclass, Sound
Recording Copyright Classes, Lyrics Copyright Subclasses,
and Musical-Composition (Non-Lyric) Subclasses*

197. Plaintiffs reallege and incorporate by reference all allegations in this complaint.

198. Section 1202(a) of the DMCA prohibits knowingly providing or distributing false CMI with the intent to induce, enable, facilitate, or conceal infringement. 17 U.S.C. § 1202(a).

199. Google provides and distributes CMI in connection with audio tracks and lyric outputs generated through its Lyria-powered systems. Google's platforms attach and circulate CMI identifying a purported creator or owner for generated music. For example, ProducerAI displays user account names alongside track titles on publicly accessible output pages, presents collections labeled "Playlist created by [username]," and structures terms stating that the user "owns" the output. These creator, owner, and licensing designations are

conveyed in connection with copies of works and function as CMI within the meaning of § 1202(c).

200.　On information and belief, Google's systems generate and distribute outputs that incorporate, recast, or are substantially similar to protectable expression from Plaintiffs' copyrighted works. When Google distributes such an output while designating a user or Google as the "creator" or "owner," Google provides and distributes CMI that is false.

201.　Google provides and distributes this false CMI knowingly and with the intent to induce, enable, facilitate, or conceal infringement. Google knows its systems can produce outputs that implicate existing protected works — it has acknowledged that its filters are "not foolproof" and has invited rights-holder reports. Yet Google designed its products so that outputs are published with prominent user attribution and ownership messaging that invites downstream use while omitting the true rights holders whose expression is embodied in the outputs. This false CMI encourages users and downstream platforms to treat outputs as cleared and owned by the labeled "creator," impairing attribution, licensing, and enforcement.

202.　Google's violations were willful. Google designed a distribution system that replaces authentic CMI with user-attribution CMI for outputs generated from a system Google knows was built on copyrighted works, while publicly acknowledging the system's output-checking limitations.

203.   Plaintiffs seek all remedies available under 17 U.S.C. § 1203, including statutory damages, injunctive relief requiring corrective measures, costs, and attorneys' fees.

## Count VIII

## Contributory Copyright Infringement,

## 17 U.S.C. § 501

*Brought on behalf of the Sound Recording Copyright Classes, Lyrics Copyright Subclasses, and Musical-Composition (Non-Lyric) Subclasses*

204.   Plaintiffs reallege and incorporate by reference all allegations in this complaint.

205.   Plaintiffs bring this Count for contributory infringement based on Google's knowledge of, and material contribution to, third-party direct infringement carried out through Google's generative music systems.

206.   This Count is brought only with respect to works for which the registration prerequisite of § 411(a) is satisfied or does not apply.

207.   Third parties have directly infringed Plaintiffs' and Class Members' copyrights through Google's systems. Users of Google's music-generation products generate, download, and disseminate audio and lyrical outputs that, on information and belief, copy, recast, or are substantially similar to protectable elements of Plaintiffs' works. Users distribute those outputs by uploading them to YouTube and other platforms, synchronizing them to video content, and exploiting them commercially. Additionally, Google offers tools that generate continuations, transformations, and edits from uploaded audio.

85

On information and belief, users upload copyrighted recordings and use these tools to generate unauthorized derivative works.

208.   Google knew or was willfully blind to the fact that its systems would be used to create and disseminate infringing works. Google's knowledge is established by its admissions: Google acknowledges that its output checks are "not foolproof," invites rights-holder reports, and embeds provenance watermarks in every output — infrastructure that reflects awareness that generated tracks will circulate widely and may collide with existing works. Google also operates Content ID and rights-management systems that give it unmatched knowledge of what music is copyrighted and who owns it.

209.   Google materially contributed to third-party infringement by supplying the models, servers, and interfaces that generate the infringing outputs; providing product features that allow users to download, fix, and share those outputs; integrating AI-generated music into YouTube creator workflows that encourage distribution and reuse; and offering continuation and editing tools that facilitate creation of unauthorized derivative works from copyrighted recordings. Google's contribution is not passive hosting — Google's systems *generate* the infringing audio and lyrics, deliver them to users, and provide the pathways for distribution.

210.   Google's intentional removal of CMI from training data, as alleged in Count V, further materially contributes to downstream infringement by concealing the provenance and ownership of works whose expression is incorporated into outputs.

211.   As a direct and proximate result, Plaintiffs and Class Members have suffered and continue to suffer harm, including market substitution, lost licensing revenue, and impairment of attribution and enforcement.

212.   Plaintiffs seek injunctive relief, statutory damages for registered works or actual damages and profits, and costs and attorneys' fees. With respect to previously unregistered works, Plaintiffs seek actual damages and profits and injunctive relief, and will supplement upon registration issuance.

### Count IX

### Vicarious Copyright Infringement,
### 17 U.S.C. § 501

*Brought on behalf of the Sound Recording Copyright Classes, Lyrics Copyright Subclasses, and Musical-Composition (Non-Lyric) Subclasses*

213.   Plaintiffs reallege and incorporate by reference all allegations in this complaint.

214.   Plaintiffs bring this Count for vicarious infringement based on Google's right and ability to supervise the infringing activity and its direct financial benefit from that activity.

215.   This Count is brought only with respect to works for which the registration prerequisite of § 411(a) is satisfied or does not apply.

216.   Third parties have directly infringed Plaintiffs' and Class Members' copyrights through Google's systems, as alleged in Count VIII.

217.   Google has the right and ability to supervise and control the infringing activity. Google controls the models, servers, and interfaces that generate outputs. Google sets and enforces content policies governing prompts

and outputs. Google implements, modifies, and enforces prompt filters, output filters, and similarity checks. Google controls output length, generation limits, and usage quotas. Google can monitor, log, and audit prompts and outputs, and can remove or disable access to outputs that violate policies. Google can suspend or terminate users who engage in infringing conduct. Google controls the distribution mechanisms through which outputs are saved, downloaded, published, and shared.

218.   Google derives a direct financial benefit from the infringing activity. Google monetizes its music-generation systems through paid features, subscriptions, and platform engagement. The commercial appeal of Google's products increases when outputs are closer substitutes for licensed music — the very characteristic that makes infringement foreseeable. Google also uses user prompts, interactions, and generated outputs to improve its models, meaning infringing outputs provide Google with data that enhances its commercial offerings.

219.   Despite its supervisory ability and financial benefit, Google has not implemented safeguards adequate to prevent the foreseeable infringement its systems enable. Google acknowledges its approach is "not foolproof" yet continues to expand distribution channels and product features that facilitate generation, fixation, and dissemination of infringing outputs.

220.   As a direct and proximate result, Plaintiffs and Class Members have suffered and continue to suffer harm, including market substitution, lost licensing revenue, and impairment of attribution and enforcement.

221.   Plaintiffs seek injunctive relief, statutory damages for registered works or actual damages and profits, and costs and attorneys' fees, on the same terms as Count VIII.

**Count X**

**False Endorsement, Lanham Act § 43(a)(1)(A),
15 U.S.C. § 1125(a)(1)(A)**

*Brought on behalf of the False Endorsement Subclass*

222.   Plaintiffs reallege and incorporate by reference all allegations in this complaint.

223.   Plaintiffs Woulard, ATS, the Burjek Plaintiffs, the Directrix Plaintiffs, Fiennes, Mell, and Kogon bring this Count individually and on behalf of the *False Endorsement Subclass* for false endorsement and false association under 15 U.S.C. § 1125(a)(1)(A).

224.   Plaintiffs and *False Endorsement Subclass* members have built commercial goodwill in their professional identities. Their artist names, stage names, distinctive vocal characteristics, and other identity-linked attributes function as source identifiers in the marketplace, signaling to listeners, licensees, and industry partners who created, performed, or authorized a recording. Plaintiffs and Subclass members participate in commercial markets for endorsements, collaborations, and licensed uses of their identities. The ability to control whether and how their identities are used commercially is a core component of their economic value as artists.

225.   Google designed its generative music systems to accept artist identity cues as functional inputs. Google publicly states that "if your prompt

89

names a specific artist," its system treats the name as "broad creative inspiration" and generates a track that "shares a similar style or mood."[109] Google also markets Lyria 3 as generating "realistic, natural, and nuanced vocals" with configurable characteristics. By design, Google's system uses artists' identities, including names, styles, and vocal attributes, to shape the outputs it generates and distributes.

226. Google further normalized the association between real artists and AI-generated music through Dream Track, a YouTube Shorts experiment in which users selected a participating artist from a carousel and generated a soundtrack featuring the "AI-generated voice" of that artist. Dream Track taught consumers that Google's AI music products are associated with, and authorized by, real recording artists. Those consumer expectations carry over when the same underlying technology generates outputs invoking non-participating artists who did not consent.

227. Google's outputs circulate in commerce without adequate disclosure. Generated tracks can be downloaded or shared via link. SynthID watermarking is imperceptible to listeners. Once an output leaves the generation interface, no consumer-facing indication remains that the track is AI-generated or that the invoked artist did not authorize it. Google designed these distribution features, and acknowledged that its filters are "not foolproof",

---

[109] Yawili, Joël, "A new way to express yourself: Gemini can now create music", Google Blog, Feb. 18, 2026, https://blog.google/innovation-and-ai/products/gemini-app/lyria-3/

while knowing that outputs incorporating artist identity cues would circulate widely.

228.   Google's conduct creates a likelihood of confusion as to affiliation, connection, association, sponsorship, or approval. When a consumer encounters an AI-generated track that was prompted with an artist's name and that exhibits the stylistic and vocal characteristics associated with that artist, the consumer is likely to believe the artist endorsed, approved, or was affiliated with the track or the service that generated it. This confusion is heightened because Google markets its outputs as "high-fidelity" and "professional-grade", qualities that make AI-generated tracks harder to distinguish from human-created recordings.

229.   More broadly, when AI-generated music that is commercially indistinguishable from human-created recordings, including that created by Lyria 3, circulates in the same licensing channels, playlists, and content libraries without adequate disclosure of its origin, the result is marketplace confusion about whether music available in those channels is the work of human artists. That confusion directly impairs the commercial value of Plaintiffs' identities as source identifiers.

230.   Google's conduct was intentional and willful. Google designed its system to accept artist-name prompts, marketed vocal realism as a feature, deployed distribution mechanisms that predictably strip contextual disclaimers, and acknowledged that its filtering approach is not foolproof.

231.   As a direct and proximate result, Plaintiffs and the *False Endorsement Subclass* have suffered and continue to suffer injury, including loss of control over their identities and the commercial use of their goodwill, reputational harm from unauthorized and potentially inferior uses attributed to them, and diversion of endorsement and licensing opportunities.

232.   Plaintiffs seek injunctive relief under 15 U.S.C. § 1116, recovery of Google's profits and Plaintiffs' damages under § 1117(a), costs, and attorneys' fees in this exceptional case.

## COUNT XI
### False Advertising, Lanham Act § 43(a)(1)(B),
### 15 U.S.C. § 1125(a)(1)(B)

*Brought on behalf of the False Advertising Subclass*

233.   Plaintiffs reallege and incorporate by reference all allegations in this complaint.

234.   Plaintiffs Woulard, ATS, the Burjek Plaintiffs, the Directrix Plaintiffs, Fiennes, Mell, and Kogon bring this Count individually and on behalf of the *False Advertising Subclass* under 15 U.S.C. § 1125(a)(1)(B).

235.   Plaintiffs and *False Advertising Subclass* members are commercial competitors of Google in the markets for licensed and commissioned music. Plaintiffs earn revenue from synchronization licensing, production and library music licensing, and commissioned music, songwriting, production, and vocal performance services. Google competes in those same markets by offering and distributing generative music systems that produce finished, project-ready music and lyrics on demand for the same uses and the same buyers.

92

236.   In commercial advertising and promotion directed at consumers, creators, platforms, brands, and advertisers, Google has made and continues to make false or misleading statements about its generative music products. These statements were disseminated through Google's official channels, including the Google DeepMind blog, the YouTube Official Blog, Google product pages, press materials, and public-facing model documentation, and were directed at the audiences who make purchasing and adoption decisions in the markets where Plaintiffs compete. These statements include, by way of representative example, the categories described in the following paragraphs.

237.   Google stated that it has been "very mindful of copyright and partner agreements" in training Lyria 3[110], and that it trains only on music it has "a right to use under our terms of service, partner agreements, and applicable law."[111] On information and belief, and as alleged in this Complaint, Google trained its generative music models by copying copyrighted recordings, compositions, and lyrics at an industrial scale without authorization from the independent artists who created them. No term of service or partner agreement authorized the mass copying of Plaintiffs' and Class Members' works for use as AI training data.

---

[110] Id.

[111] Lung, Natalie, "Google and Apple bring AI music creation to mainstream consumers", LA Times, Feb. 18, 2026, https://www.latimes.com/business/story/2026-02-18/google-apple-bring-ai-music-creation-to-mainstream-consumers (statement by Google spokesperson, quoted by LA Times)

238.   Google stated that music generation with Lyria 3 is "designed for original expression, not for mimicking existing artists."[112] On information and belief, Google's models can and do produce outputs that incorporate, recast, or closely resemble protected expression from existing works. Google's acknowledgment that its filters are "not foolproof" and its invitation to rights-holder reports confirm that outputs can collide with existing copyrighted works.[113]

239.   Google stated that it has "filters in place to check outputs against existing content," conveying to commercial users that outputs have been meaningfully vetted and are suitable for downstream commercial use.[114] Output filtering does not prevent or remedy the unauthorized copying at ingestion, does not ensure outputs are free of third-party rights, and does not eliminate the market substitution caused by mass dissemination of AI-generated music that competes directly with human-created recordings.

240.   Google's statements are also misleading by omission. Google does not disclose the specific copyrighted works used to train its models, does not disclose whether independent artists' works were copied, and does not disclose the means by which it acquired such works.[115] These omissions are material to

---

[112] Yawili, Joël, "A new way to express yourself: Gemini can now create music", Google Blog, Feb. 18, 2026, https://blog.google/innovation-and-ai/products/gemini-app/lyria-3/

[113] Id.

[114] Id.

[115] https://deepmind.google/models/model-cards/lyria-3/

the decisions of consumers, creators, platforms, and licensees choosing between Google's AI-generated music and licensed human-created music.

241. Google's false and misleading statements were material. They bear directly on whether Google's products are lawfully sourced, whether outputs are reliably original, and whether outputs are safe for commercial use, considerations that are central to the purchasing and adoption decisions of the relevant audience.

242. Google's false advertising has caused and continues to cause competitive injury to Plaintiffs and the *False Advertising Subclass*, including diversion of licensing and commissioning opportunities, suppression of licensing rates in sync and production music markets, and loss of market share to AI-generated substitutes that buyers adopted in reliance on Google's representations about sourcing, originality, and safety.

243. Google's false advertising was willful. Google is a sophisticated participant in the music ecosystem, understands that its representations about sourcing and originality would influence commercial adoption, and disseminates those representations while withholding material facts uniquely within its control.

244. Plaintiffs seek injunctive relief under 15 U.S.C. § 1116 requiring corrective disclosures, recovery of Google's profits and Plaintiffs' damages under § 1117(a), costs, and attorneys' fees in this exceptional case.

**Count XII**

**Violation of Illinois Biometric Information Privacy Act,
740 ILCS 14/1 et seq.)**

*Brought on behalf of the Illinois BIPA Subclass*

245.   Plaintiffs reallege and incorporate by reference all allegations in this complaint.

246.   Plaintiffs Woulard, the Burjek Plaintiffs, and the Directrix Plaintiffs bring this Count individually and on behalf of the *Illinois BIPA Subclass*. This Subclass consists of natural persons residing in Illinois.

247.   BIPA defines "biometric identifier" to include a "voiceprint." 740 ILCS 14/10. A voiceprint is a biometric identifier by statutory definition. Section 15(b) prohibits a private entity from collecting, capturing, or otherwise obtaining a person's biometric identifier without first providing written notice of the collection and its purpose and receiving a written release from the subject. 740 ILCS 14/15(b). Section 15(a) requires a private entity in possession of biometric identifiers to develop and publicly disclose a written retention schedule and guidelines for permanent destruction. 740 ILCS 14/15(a). Section 15(c) prohibits selling, leasing, trading, or otherwise profiting from a person's biometric identifier. 740 ILCS 14/15(c). Section 15(d) prohibits disclosing or disseminating biometric identifiers to third parties without consent. 740 ILCS 14/15(d).

248.   Plaintiffs Woulard, the Burjek Plaintiffs, and the Directrix Plaintiffs are Illinois residents whose distinctive voices are embodied in sound recordings

that Google copied, ingested, and processed through its music-generation training pipeline.

249. Google's generative music systems generate "realistic, natural, and nuanced vocals" with configurable human voice characteristics — including whether the singer is male or female, baritone or soprano, and whether the voice is "rich, gravelly, soulful, [or] breathy." Google also markets vocal generation in multiple languages and across diverse musical styles. On information and belief, Google could not have built these capabilities without extracting, modeling, and storing computational representations of the distinctive characteristics of human voices from the vocal performances in its training data — including timbre, pitch, tone, cadence, articulation, phrasing, dynamics, and other attributes that make individual voices identifiable and distinguishable. Those computational representations are voiceprints within the meaning of BIPA.

250. Google's public disclosures confirm that its music and voice systems extract biometric voiceprints. ProducerAI's Privacy Notice, for a platform powered by Lyria 3, states that voice-based features may involve extracting a "biometric voiceprint" from a vocal recording.[116] The Privacy Notice further states that Google may disclose audio and extracted data, including biometric voiceprints, to third-party providers for processing, and may use that data to develop future features and improve the AI and machine learning

---

[116] https://www.producer.ai/privacy

models that power its services.[117] Google used the statutory term "biometric voiceprint" in its disclosure. The extraction, storage, and commercial use of voiceprints that Google acknowledges in its Privacy Notice is, on information and belief, the same category of vocal-feature processing that occurs during the training pipeline, because the training pipeline is what builds the model capabilities that the consumer-facing features then deploy.

251.  Google collected, captured, and obtained Plaintiffs' and *BIPA Subclass* members' voiceprints without complying with any of BIPA's requirements. Specifically:

(a) Google did not develop, publicly disclose, or comply with a written retention schedule and guidelines for permanently destroying the voiceprints it collected, as required by § 15(a).

(b) Google did not inform Plaintiffs or *BIPA Subclass* members in writing that their biometric identifiers were being collected or stored, did not inform them of the specific purpose and length of term for collection, storage, and use, and did not receive a written release from any Plaintiff or Subclass member, as required by § 15(b).

(c) Google profited from Plaintiffs' and *BIPA Subclass* members' voiceprints by using them to develop, improve, and commercialize music- and voice-related AI products, in violation of § 15(c).

(d) On information and belief, Google disclosed or disseminated Plaintiffs' and *BIPA Subclass* members' voiceprints to third-party vendors and service

---

[117] Id.

providers involved in data processing, labeling, evaluation, and model development, without obtaining consent, in violation of § 15(d).

(e) Google failed to store, transmit, and protect biometric identifiers using the reasonable standard of care within its industry and in a manner at least as protective as the manner in which Google protects other confidential and sensitive information, in violation of § 15(e).

252. Each collection, capture, or obtainment of a voiceprint from a distinct vocal performance constitutes a separate BIPA violation. *See Cothron v. White Castle System, Inc.*, 2023 IL 128004.

253. Google's violations were intentional or reckless, or at minimum negligent. Google is a sophisticated technology company that operates in Illinois, is aware of BIPA's requirements, and acknowledged in its privacy disclosures that its voice-related AI systems extract biometric voiceprints. Google nevertheless proceeded without the written notices, releases, retention policies, and safeguards Illinois law requires.

254. Plaintiffs' and *BIPA Subclass* members' injuries occurred primarily and substantially in Illinois. Plaintiffs are Illinois residents. The loss of control over their biometric identifiers, and the privacy harms resulting from that loss, were suffered in Illinois.

255. This Count is not preempted by the Copyright Act. BIPA protects biometric privacy rights that are qualitatively different from copyright's protection of original expression. This Count requires proof of elements,

including collection of biometric identifiers, absence of written consent, and absence of retention policies, that have no equivalent in copyright law.

256. Plaintiffs and the *BIPA Subclass* seek all relief available under 740 ILCS 14/20, including: (a) liquidated damages of $1,000 per negligent violation and $5,000 per intentional or reckless violation, or actual damages, whichever is greater; (b) injunctive relief requiring Google to cease collecting, storing, using, and disclosing voiceprints without BIPA-compliant notice and written releases, and requiring deletion and permanent destruction of unlawfully obtained biometric data; and (c) reasonable attorneys' fees, costs, and other relief the Court deems just and proper.

## Count XIII

### Violation of the Illinois Right of Publicity Act (IRPA), 765 ILCS 1075/1 et seq.

*Brought on behalf of the Illinois Right of Publicity Act Subclass*

257. Plaintiffs reallege and incorporate by reference all allegations in this complaint.

258. Plaintiffs Woulard, the Burjek Plaintiffs, and the Directrix Plaintiffs bring this Count individually and on behalf of the *Illinois Right of Publicity Subclass*. This Subclass consists of natural persons.

259. IRPA recognizes that the "right to control and to choose whether and how to use an individual's identity for commercial purposes" belongs to the individual. 765 ILCS 1075/10. "Identity" includes an individual's "voice." 765 ILCS 1075/5. IRPA prohibits using an individual's identity for commercial purposes without previous written consent. 765 ILCS 1075/30(a).

260.  Plaintiffs Woulard, the Burjek Plaintiffs, and the Directrix Plaintiffs are Illinois residents and recording artists whose distinctive voices are embodied in sound recordings that Google copied, ingested, and processed through its music-generation training pipeline. Their voices, including distinctive characteristics of timbre, tone, cadence, phrasing, and stylistic vocal expression, are part of their identities within the meaning of IRPA.

261.  Google used Plaintiffs' and *IRPA Subclass* members' identities, including their voices, for commercial purposes without prior written consent. Google did so by copying vocal performances from Plaintiffs' recordings, extracting and modeling the distinctive vocal characteristics embodied in those performances, and using those characteristics to develop, train, and operate commercial music-generation products — including Lyria 3, Dream Track, ProducerAI, and Music AI Sandbox — that Google monetizes through consumer and creator products, paid subscriptions, and developer APIs. Training and operating a commercial music generator on the vocal characteristics extracted from an artist's performances is a commercial use of that artist's voice.

262.  Google's commercial use of Plaintiffs' voices is not news reporting, a public-affairs broadcast, or a noncommercial account of public interest. It is the development, advertising, and monetization of a for-profit AI music service that generates vocal tracks for consumer and commercial use.

263.  Additionally and independently, IRPA prohibits knowingly distributing or making available to the general public a sound recording containing an "unauthorized digital replica", defined as a newly created AI-

generated representation of an individual's voice, fixed in a sound recording in which the individual did not actually perform, and that a reasonable person would believe is that person's voice being imitated. 765 ILCS 1075/5, 1075/30(b).

264.    On information and belief, Google's systems generate and distribute sound recordings that contain unauthorized digital replicas of real performers' voices. Google designed Lyria 3 to generate "realistic, natural, and nuanced vocals" with configurable characteristics that map to attributes of the human voice. Google permits prompts that reference specific artists and treats those references as "creative inspiration" for generating tracks that share a "similar style or mood." When the resulting output replicates the distinctive vocal characteristics of an identifiable performer and is distributed through Google's platforms, that output is an unauthorized digital replica within the meaning of IRPA.

265.    IRPA also imposes liability on a person who materially contributes to, induces, or otherwise facilitates the distribution of unauthorized digital replicas after obtaining actual knowledge of the violation. 765 ILCS 1075/30(d). Google designed, built, and operates the generative systems that create sound recordings containing digital replicas, controls the interfaces through which those recordings are generated and distributed, enables users to download and share outputs, and has acknowledged that its output-checking approach is "not foolproof." To the extent users generate and disseminate outputs

containing unauthorized digital replicas through Google's services, Google materially contributes to and facilitates that distribution.

266. Google did not obtain written consent from Plaintiffs or *IRPA Subclass* members to use their identities for any commercial purpose, including to develop or operate commercial music-generation products or to generate, distribute, or facilitate the distribution of sound recordings imitating their voices.

267. Google's violations were willful and knowing. Google understood the commercial and legal significance of using artists' voices for AI music generation — it negotiated with major labels about voice-licensing structures (as reported by the Financial Times in August 2023, citing four sources familiar with the talks), launched Dream Track with consenting artists whose AI-generated voices were a headline feature, and publicly discussed "AI music principles" emphasizing respect for artists' rights. Google nevertheless used Plaintiffs' and *IRPA Subclass* members' voices without consent.

268. As to Plaintiffs and the *IRPA Subclass*, the challenged uses and injuries occurred primarily and substantially in Illinois. Google marketed and sold subscriptions in Illinois, ingested and exploited Illinois artists' voices, and disseminated outputs to and within Illinois.

269. This Count is not preempted by the Copyright Act. IRPA protects an individual's right to control commercial use of their *identity,* including their voice as a component of personal identity, not the *expression* fixed in a copyrighted sound recording. This Count requires proof of elements that have

no equivalent in copyright law: commercial use of an individual's identity without written consent, and, for the digital-replica theory, that a reasonable person would believe the output is the individual's voice being imitated. The 2024 amendments to IRPA, which added the definitions of "digital replica" and "unauthorized digital replica" (765 ILCS 1075/5), prohibited knowingly distributing sound recordings containing unauthorized digital replicas (§ 30(b)), and imposed liability for materially contributing to such distribution (§ 30(d)), confirm that the Illinois legislature intended IRPA to reach the conduct at issue here, independent of any copyright interest in the underlying recording.

270.   Plaintiffs and the *IRPA Subclass* have suffered and continue to suffer injury, including loss of control over commercial use of their identities, dilution and commodification of their voices, reputational harm, and economic losses including diversion of licensing value in their personas and diminished demand for authentic vocal performances.

271.   Plaintiffs seek all relief available under IRPA, including actual damages, profits attributable to the unauthorized use, injunctive relief, and such other relief as the Court deems just and proper. 765 ILCS 1075/40.

## Count XIV

### Violation of Illinois Uniform Deceptive Trade Practices Act (UDTPA), 815 ILCS 510/1 et seq. (Injunctive Relief)

*Brought on behalf of the Illinois UDTPA Subclass (injunctive relief only)*

272.   Plaintiffs reallege and incorporate by reference all allegations in this complaint.

273.   Plaintiffs Woulard, the Burjek Plaintiffs, and the Directrix Plaintiffs bring this Count individually and on behalf of the *Illinois UDTPA Subclass* seeking injunctive relief under 815 ILCS 510/3.

274.   Plaintiffs and Class Members are engaged in trade and commerce by creating, producing, licensing, and distributing music. Google conducts substantial business in Illinois and markets, distributes, and operates its generative music systems in Illinois.

275.   Google has engaged in deceptive trade practices likely to cause confusion or misunderstanding in the marketplace, in violation of 815 ILCS 510/2. Google's deceptive practices include:

(a) *Confusion as to source, sponsorship, and approval.* Google designs its systems to accept artist-identity cues as inputs to generation, markets vocal realism as a product feature, and distributes outputs through mechanisms, including download links, share links, and public output pages, that strip the generation-context disclosures present within Google's interface. Once an output leaves the interface, no consumer-facing signal identifies the track as AI-generated, discloses the provenance of the underlying expression, or indicates whether any artist endorsed or authorized the output. Google's imperceptible SynthID watermark is inaudible to listeners and does not function as a consumer disclosure. The result is that realistic, professional-grade music circulates in commercial channels in a manner likely to cause confusion about whether real artists created, endorsed, or approved the tracks, and about whether the tracks are authorized for commercial use.

(b) *Misleading representations about product characteristics and quality.*
Google presents AI-generated outputs as user-owned and suitable for
publication, sharing, and commercial exploitation, while omitting material
facts: that the system was built by copying copyrighted works without
authorization, that Google's own safeguards do not ensure outputs are free of
protected expression, and that downstream users face legal risk. Google's
"responsible AI" messaging, including representations about output filtering
and content checks, creates a misleading impression that outputs are
effectively cleared for commercial use. Google knows that impression is false.
Its own internal assessment is that its filtering approach is "not foolproof," and
it has built a rights-holder reporting mechanism that presupposes infringing
outputs will reach the public. Google chose to market the reassurance while
burying the limitation.

276. Google's deceptive practices are likely to cause confusion and
misunderstanding among consumers, creators, licensees, and the public
regarding the source and authorization of AI-generated music and its
suitability for commercial use. Actual confusion and actual damages need not
be shown. 815 ILCS 510/3.

277. Plaintiffs and Class Members are persons likely to be damaged by
Google's deceptive practices. Google's conduct diverts demand from licensed
music, causes marketplace confusion about source and authorization, impairs
attribution and provenance, and increases downstream exploitation of outputs
in the same markets where Plaintiffs earn their livelihoods.

278.   This Count is not preempted by the Copyright Act. It requires proof of deceptive trade practices and a likelihood of confusion or misunderstanding as to source, sponsorship, approval, and product characteristics, elements qualitatively different from the exclusive rights protected by copyright.

279.   Plaintiffs and the *Illinois UDTPA Subclass* seek preliminary and permanent injunctive relief under 815 ILCS 510/3 to prevent Google's ongoing deceptive trade practices, including injunctive relief requiring adequate provenance disclosures and practices sufficient to prevent confusion regarding source, authorization, and rights clearance. If the Court finds Google willfully engaged in deceptive trade practices, Plaintiffs also seek reasonable attorneys' fees under 815 ILCS 510/3.

**Count XV**

**Unjust Enrichment (Illinois Common Law)**

*Brought on behalf of the Unjust Enrichment Subclass*

280.   Plaintiffs reallege and incorporate by reference all allegations in this complaint.

281.   Plaintiffs Woulard, the Burjek Plaintiffs, and the Directrix Plaintiffs bring this Count individually and on behalf of the *Illinois Unjust Enrichment Subclass.* This Count is pled in the alternative pursuant to Fed. R. Civ. P. 8(d)(2)–(3). Plaintiffs do not seek duplicative recovery.

282.   Google obtained substantial benefits from Plaintiffs' and Class Members' creative works, voices, and associated rights without permission and without compensation. These benefits include avoided licensing and acquisition

costs for the recordings, compositions, lyrics, and vocal performances Google copied and used; product capability and competitive advantage derived from training on copyrighted music rather than public-domain or stock music; revenues from the commercialization of music-generation products built on that foundation; and ongoing improvement value from the collection and recycling of outputs and usage data within Google's ecosystem.

283.  Google received these benefits at Plaintiffs' and Class Members' expense. Plaintiffs invest time, talent, and resources to create original works and depend on licensing, royalties, and market demand. Google's conduct diverted value from Plaintiffs by replacing licensed human-created music with AI-generated substitutes and by weakening the attribution and licensing infrastructure that supports lawful markets.

284.  Google's retention of these benefits is unjust because it is rooted in conduct that goes beyond rights equivalent to the Copyright Act and therefore constitutes an "extra element" under Illinois preemption law. That conduct includes: (a) intentional removal, alteration, and provision of false copyright management information in violation of 17 U.S.C. § 1202, severing works from their owners and impairing licensing and enforcement; (b) collection and commercial exploitation of Illinois residents' biometric identifiers without the notice and written consent required by BIPA; and (c) commercial use of Illinois residents' identities, including their voices, without the written consent required by IRPA. Each of these wrongs requires proof of elements qualitatively

different from copyright's exclusive rights and independently renders Google's retention of benefits inequitable.

285.  Equity and good conscience do not permit Google to retain these benefits without restitution. Google could have pursued lawful licensing. Instead, Google chose a strategy that externalized costs onto independent creators and captured the value for itself.

286.  Plaintiffs and the *Illinois Unjust Enrichment Subclass* seek restitution of benefits unjustly obtained by Google, including disgorgement of profits attributable to the unjust enrichment, an accounting, and such other equitable relief as the Court deems just and proper.

287.  To the extent legal remedies under the Copyright Act, DMCA, or BIPA are inadequate to disgorge Google's full unjust gains — including enterprise-level commercial advantages and competitive position derived from the unlawful conduct — equity requires restitution and ancillary relief.

### Count XVI

### Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS 505/1 et seq.

*Brought on behalf of the Illinois Consumer Fraud Subclass*

288.  Plaintiffs reallege and incorporate by reference all allegations in this complaint.

289.  Plaintiffs Woulard, ATS, the Burjek Plaintiffs, and the Directrix Plaintiffs bring this Count individually and on behalf of the Illinois Consumer Fraud Subclass under 815 ILCS 505/2 and 505/10a.

290.    Google engaged in trade and commerce in Illinois within the meaning of ICFA by marketing, offering, and distributing generative music services, including music-generation features in the Gemini app and ProducerAI, directly to Illinois residents, Illinois businesses, and Illinois-based creators, and by encouraging Illinois users to download, share, and commercially exploit AI-generated music. Google's challenged conduct occurred primarily and substantially in Illinois as to Plaintiffs and the *Illinois Consumer Fraud Subclass*: Google targeted Illinois markets, transacted with Illinois residents through paid plans and subscriptions, delivered the challenged products and outputs into Illinois, and caused foreseeable economic injury in Illinois to Illinois-based musicians and songwriters.

291.    In the course of trade and commerce, Google engaged in deceptive and unfair acts and practices. Google's deceptive conduct includes representing that its generative music models were responsibly sourced and "mindful of copyright and partner agreements," that its outputs are "designed for original expression, not for mimicking existing artists," and that output filtering meaningfully vets generated tracks for rights conflicts — while omitting that Google trained its models by copying copyrighted works without authorization, that outputs may incorporate protected expression, and that the ownership and commercial-use messaging Google provides does not equate to rights clearance. These representations and omissions, individually and collectively, create a misleading impression that Google's AI-generated music is

110

lawfully sourced, reliably original, and safe for commercial exploitation, when it is not.

292.   Independently, Google's conduct is "unfair" within the meaning of ICFA. Google leverages opaque ownership and commercialization messaging to drive adoption and downstream exploitation while withholding material facts uniquely within its control. This conduct offends established public policy embodied in the Copyright Act and Illinois statutes protecting creators' attribution, identity, and biometric privacy interests, and causes substantial economic injury to Illinois creators that is not outweighed by countervailing benefits and could not reasonably be avoided by the injured parties.

293.   Google's representations and omissions were material. A reasonable user, platform, advertiser, or licensee deciding whether to generate, publish, or synchronize Google-generated music, and whether to do so instead of licensing human-created music, would consider it important whether the system was lawfully sourced, whether outputs are reliably original, and whether the ownership framing equates to rights clearance.

294.   Google intended that consumers, creators, platforms, and licensees rely on the above representations and omissions. Google designed its marketing and product messaging to increase adoption, engagement, and commercial use of AI-generated music.

295.   Google's deceptive and unfair conduct proximately caused actual economic injury to Plaintiffs and the *Illinois Consumer Fraud Subclass*. Google's representations induced widespread commercial substitution of AI-generated

music for licensed human-created music in the Illinois and national markets where Plaintiffs compete. Plaintiffs suffered lost and diminished licensing income, suppressed synchronization and production music rates, diverted opportunities where buyers selected AI-generated substitutes in reliance on Google's representations, and out-of-pocket costs associated with monitoring and responding to marketplace confusion caused by Google's conduct.

296.   Google's conduct was willful, knowing, and in reckless disregard of the rights and interests of Plaintiffs and the *Illinois Consumer Fraud Subclass.*

297.   Plaintiffs and the *Illinois Consumer Fraud Subclass* seek all relief available under ICFA, including actual economic damages, punitive damages to the extent permitted by 815 ILCS 505/10a(c), injunctive relief, attorneys' fees and costs, and such other relief as the Court deems just and proper.

## **PRAYER FOR RELIEF**

298.   Plaintiffs, individually and on behalf of all others similarly situated, respectfully request that this Court enter judgment against Defendant Google LLC and award the following relief:

A. *Class Certification.* Certify the Classes and Subclasses defined herein pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3), appoint Plaintiffs as Class Representatives, and appoint Plaintiffs' counsel as Class Counsel.

B. *Judgment.* Enter judgment in favor of Plaintiffs and all Class and Subclass Members and against Defendant Google on all Counts.

C. *Injunctive Relief.*

(1) *Copyright Act (17 U.S.C. § 502).* Permanently enjoin Google, its officers, agents, employees, affiliates, and all persons acting in concert with them, from further reproducing, distributing, or creating derivative works from Plaintiffs' and Class Members' copyrighted sound recordings, musical compositions, and lyrics without authorization, including by copying, ingesting, retaining, or using such works in connection with the development, training, fine-tuning, evaluation, or operation of generative music systems.

(2) *DMCA § 1202 (17 U.S.C. § 1203).* Permanently enjoin Google from removing, altering, or rendering unreadable copyright management information from Plaintiffs' and Class Members' works, from distributing works with CMI removed or altered, and from providing or distributing false CMI in connection with AI-generated outputs; and require Google to implement reasonable measures to restore or properly attribute CMI where feasible.

(3) *DMCA § 1201 (17 U.S.C. § 1203).* Permanently enjoin Google from circumventing technological access controls protecting Plaintiffs' and Class Members' works and from trafficking in circumvention technologies.

(4) *Lanham Act (15 U.S.C. § 1116).* Permanently enjoin Google from using Plaintiffs' and Subclass Members' artist identifiers in connection with generative music services in a manner likely to cause confusion as to endorsement, sponsorship, approval, or affiliation; and

113

permanently enjoin Google from making false or misleading representations in commercial advertising or promotion regarding the sourcing, originality, or rights-clearance status of its generative music products and outputs, and require corrective disclosures as the Court deems appropriate.

(5) *BIPA (740 ILCS 14/20).* Permanently enjoin Google from collecting, storing, using, or disseminating biometric identifiers and biometric information of Illinois Subclass Members without BIPA-compliant notice and written releases; require deletion and permanent destruction of all unlawfully obtained biometric data, including voiceprints and biometric voice templates.

(6) *IRPA (765 ILCS 1075/40).* Permanently enjoin Google from using Plaintiffs' and *IRPA Subclass* Members' identities, including their voices, for commercial purposes without prior written consent, and from distributing sound recordings containing unauthorized digital replicas.

(7) *UDTPA (815 ILCS 510/3).* Grant preliminary and permanent injunctive relief to prevent ongoing deceptive trade practices, including such corrective disclosures and provenance measures as the Court deems necessary to prevent confusion regarding source, authorization, and rights clearance.

(8) *ICFA (815 ILCS 505/10a).* Grant such injunctive relief as is necessary to prevent Google's ongoing deceptive and unfair trade practices directed at Illinois markets.

D. *Impoundment and Destruction.* Pursuant to 17 U.S.C. § 503 and 17 U.S.C. § 1203(b), order impoundment of all infringing copies and

phonorecords, and all articles by which such copies may be reproduced, including datasets, training corpora, cached copies, shards, and training checkpoints containing Plaintiffs' and Class Members' works; and upon final judgment, order destruction or other reasonable disposition thereof, including, to the extent necessary to abate ongoing infringement, deletion or remedial modification of model parameters, weights, and embeddings derived from Plaintiffs' works. Order impoundment and destruction of any circumvention technologies, devices, or components in Google's possession.

      E. *Statutory Damages.*

      (1) *Copyright Act (17 U.S.C. § 504(c)).* For each copyrighted work, including sound recordings, musical compositions, and lyrics, that is eligible for statutory damages under §§ 412 and 504(c), award statutory damages at Plaintiffs' election in amounts to be determined by the trier of fact, including up to $150,000 per work for willful infringement under § 504(c)(2).

      (2) *DMCA § 1202 (17 U.S.C. § 1203(c)(3)(B)).* For each violation of § 1202(a) or § 1202(b), award statutory damages in the amount of not less than $2,500 and not more than $25,000 per violation.

      (3) *DMCA § 1201 (17 U.S.C. § 1203(c)(3)(A)).* For each violation of § 1201, award statutory damages in the amount of not less than $200 and not more than $2,500 per act of circumvention or trafficking.

      (4) *BIPA (740 ILCS 14/20).* Award liquidated damages of $5,000 for each intentional or reckless violation and $1,000 for each negligent violation, or actual damages, whichever is greater.

F. *Actual Damages, Profits, and Disgorgement.*

(1) *Copyright Act (17 U.S.C. § 504(b)).* In the alternative to statutory damages, or for works not eligible for statutory damages, award Plaintiffs' actual damages and Google's profits attributable to the infringement, to the extent such profits are not taken into account in computing actual damages.

(2) *Lanham Act (15 U.S.C. § 1117(a)).* Award Plaintiffs Google's profits, Plaintiffs' damages, and costs of this action for false endorsement and false advertising, subject to the principles of equity. Enhance damages and profits as the Court deems just.

(3) *IRPA (765 ILCS 1075/40).* Award actual damages and Google's profits attributable to the unauthorized use of Plaintiffs' and *IRPA Subclass* Members' identities.

(4) *ICFA (815 ILCS 505/10a).* Award actual economic damages suffered by Plaintiffs and the *Illinois Consumer Fraud Subclass* as a result of Google's deceptive and unfair practices, and punitive damages to the extent permitted by law.

(5) *Unjust Enrichment.* Award restitution and disgorgement of all benefits unjustly retained by Google, order an accounting of Google's revenues and profits attributable to the unjust enrichment, and impose a constructive trust as necessary.

G. *Election of Remedies.* Plaintiffs reserve the right, as permitted by law, to elect between statutory damages and actual damages and profits on a work-by-work or claim-by-claim basis at any time before final judgment.

H. *Declaratory Relief.* Enter such declaratory judgments pursuant to 28 U.S.C. § 2201 as are necessary to establish the parties' rights and obligations, including declarations that Google's conduct as alleged herein violates the Copyright Act, the DMCA, the Lanham Act, BIPA, IRPA, the UDTPA, and ICFA.

I. *Attorneys' Fees and Costs.* Award Plaintiffs their reasonable attorneys' fees and costs under 17 U.S.C. § 505 (Copyright Act), 17 U.S.C. § 1203(b)(4)–(5) (DMCA), 15 U.S.C. § 1117(a) (Lanham Act, exceptional case), 740 ILCS 14/20(3) (BIPA), 765 ILCS 1075/55 (IRPA), 815 ILCS 510/3 (UDTPA, willful violations), 815 ILCS 505/10a(c) (ICFA), and as otherwise permitted by law.

J. *Pre- and Post-Judgment Interest.* Award pre- and post-judgment interest at the maximum rates permitted by law.

K. *Further Relief.* Grant such other and further relief, legal or equitable, as the Court deems just and proper.

## **JURY TRIAL REQUESTED**

Plaintiffs, individually and on behalf of all other Class members, request a trial by jury on all claims so triable.

Dated: March 6, 2026                     LOEVY & LOEVY

/s/ Ross Kimbarovsky
_____

Ross Kimbarovsky (6229590)
ross@loevy.com
Jon Loevy (6218524)
jon@loevy.com
Michael Kanovitz (6275233)
mike@loevy.com
Matthew Topic (6290923)
matt@loevy.com
Aaron Tucek        (98624)
aaron@loevy.com
LOEVY & LOEVY
311 North Aberdeen, 3rd Floor
Chicago, IL 60607
312.243.5900 (phone)
312.243.5902 (fax)

*Attorneys for Plaintiffs Sam Kogon, David Woulard, Attack the Sound LLC, Stan Burjek, James Burjek, Berk Ergoz, Hamza Jilani, Maatkara Wilson, Arjun Singh, Magnus Fiennes, and Michael Mell.*

118